[No. S052824. Jan. 4, 1999.]

SANTA MONICA BEACH, LTD., Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
SANTA MONICA RENT CONTROL BOARD, Real Party in Interest.

**COUNSEL**

James S. Burling, R. S. Radford, Victor J. Wolski and Eric Grant for Petitioner.

No appearance for Respondent.

Anthony A. Trendacosta, Ralph H. Goldsen, Doris M. Ganga, Joel M. Levy and Karl M. Manheim for Real Party In Interest.

Goldfarb & Lipman and Richard A. Judd for California State Association of Counties and 65 California Cities as Amici Curiae on behalf of Real Party in Interest.

**OPINION**

**MOSK, J.**—In this case we consider whether a trial court properly sustained a demurrer to a complaint alleging that a city's rent control law violates the

takings clause of the Fifth Amendment to the United States Constitution and the equivalent provision under the California Constitution because of that law's alleged failure to fulfill its stated objectives. We conclude that the trial court was correct to sustain the Santa Monica Rent Control Board's demurrer to petitioner's cause of action for inverse condemnation, and we accordingly reverse the Court of Appeal's judgment.

## I. STATEMENT OF FACTS

Petitioner Santa Monica Beach, Ltd. (SMB), alleged the following in its complaint for inverse condemnation and petition for writ of mandate, which we accept as true for purposes of assessing the complaint's sufficiency to withstand a demurrer. (*Quelimane Co.* v. *Stuart Title Guaranty Co.* (1998) 19 Cal.4th 26, 34, fn. 3 [77 Cal.Rptr.2d 709, 960 P.2d 513].)

In April 1979, the City of Santa Monica (the City) adopted a rent control charter amendment (hereinafter sometimes the Rent Control Law) and created an elected rent control board (Board) to regulate rentals. Among other things, the Rent Control Law requires that owners register each rental unit and pay annual registration fees to the Board, establishes maximum allowable rents, provides for annual general adjustments and individual adjustments of allowable rents, prohibits evictions except for specified reasons, and prescribes remedies for violations of its provisions.

The stated purpose of the Rent Control Law, as expressed in the preamble to the charter amendment, was as follows: "A growing shortage of housing units resulting in a low vacancy rate and rapidly rising rents exploiting this shortage constitute a serious housing problem affecting the lives of a substantial portion of those Santa Monica residents who reside in residential housing. In addition, speculation in the purchase and sale of existing residential housing units results in further rent increases. These conditions endanger the public health and welfare of Santa Monica tenants, especially the poor, minorities, students, young families, and senior citizens. The purpose of this Article, therefore, is to alleviate the hardship caused by this serious housing shortage by establishing a Rent Control Board empowered to regulate rentals in the City of Santa Monica so that rents will not be increased unreasonably and so that landlords will receive no more than a fair return."

SMB alleges that in practice, however, rent control has been an agent of "gentrification" in Santa Monica. During the rent-controlled decade of the 1980's, Santa Monica experienced a loss of 775 low-income-renter households, a decrease of nearly 12 percent. The number of low-income-renter

households increased over this period in every comparable city in Southern California without rent control. Santa Monica also lost 285 very-low-income-renter households. This was the largest decrease in the number of very-low-income renters of any comparable Southern California city.

Concurrent with this exodus of economically disadvantaged renters under rent control, Santa Monica experienced a 37 percent increase in the proportion of households with very high incomes between 1980 and 1990. This population shift toward upper-income households occurred during a decade when the proportion of very-high-income households dropped by more than 8 percent in Los Angeles County as a whole.

Under rent control, housing in Santa Monica has become increasingly unavailable to young families. Between 1980 and 1990, the number of family households with children in Santa Monica fell by 1,299, a decline of more than 6 percent. No comparable city in Southern California without rent control lost family households over the decade of the 1980's.

The impact of rent control has been especially harsh on young families headed by a mother with no spouse. The number of female-headed households with children under the age of 18 in Santa Monica fell by 593 between 1980 and 1990, a decrease of more than 27 percent, despite an increase in such households in Los Angeles County as a whole.

Under rent control, Santa Monica's elderly population (age 65 or over) declined by 1.7 percent between 1980 and 1990, whereas the elderly population of Los Angeles County rose by more than 15 percent over the same decade. The elderly population increased over this period in every comparable city without rent control in Southern California.

In March 1992 SMB, the owner of a 12-unit residential rental property in the City filed a petition asking the Board for permission to increase its rents. To obtain permission, SMB had to prove that its property was producing less than a "fair return" under "a comparative Net Operating Income (NOI) analysis that compares the NOI of calendar year 1978 to that of calendar year 1991, the most recent year prior to the filing of" SMB's 1992 petition. In May, after an administrative hearing, the Board's hearing examiner found that SMB's operating expenses for the base year of 1978 were $14,879, but that SMB was not entitled to a rent increase. SMB appealed to the Board, without success.

After various modifications to the Rent Control Law not relevant here, SMB filed on March 30, 1993, a second petition with the Board, this time

asking for permission to increase its rents based upon its income and expenses for 1992. A hearing examiner found that SMB was entitled "to a permanent rent increase of $3 per unit per month and temporary rent increases averaging $58 per unit per month." SMB appealed to the Board, contending, inter alia, that the hearing examiner improperly applied the law and regulations to reduce SMB's rent increase entitlement based on SMB's 1992 net operating income and to permanently deny SMB three-fourths of the general rent adjustment to be implemented in 1993 and 1994. The Board affirmed the hearing examiner's determinations.

SMB filed a combined complaint for inverse condemnation and petition for a writ of administrative mandate, naming the Board as defendant and respondent and contending that, as applied to SMB, the Rent Control Law constitutes a compensable regulatory taking of its property. In its inverse condemnation claim, SMB claims the Board has, by application of the Rent Control Law, violated SMB's rights under the Fifth Amendment rights to the United States Constitution and its rights under article I, section 19 of the California Constitution.

Specifically, SMB claims the Rent Control Law does not meet the "substantial advancement" test articulated by the United States Supreme Court in takings cases, as discussed below, because the Rent Control Law fails "to substantially mitigate some social harm that would otherwise result from the [property] owner's unregulated use of [its] property" and by "fail[ing] in practice to advance the specific purpose stated in the regulation. . . . Because [the Board's] application of the [Rent Control Law] has reduced the availability of private rental housing in Santa Monica and has made it more difficult for low-income renters, young families, and the elderly to find affordable rental housing, the [Rent Control Law] is not substantially advancing its stated purpose of implementing the housing policies of the [C]ity with regard to these population groups. [¶] The . . . Board's final determination regarding [SMB's 1993 petition] does not substantially advance a legitimate governmental interest, nor is there any close nexus between the denial of [SMB's] application for a fair rate of return on capital investments and any public harm that might result from [SMB's] unregulated operation of [its] property, because unregulated use of [its] property by [SMB] would not have resulted in the problems allegedly addressed by the [Rent Control Law], i.e., a shortage of available housing for low-income renters, young families, and the elderly."

Additional allegations within the inverse condemnation complaint charge the Board generally with depriving SMB of "essential attributes of ownership of its property, including the right to exclude others and the right to

determine the terms upon which leasehold interests in [SMB's] property will be alienated." SMB "has received no compensation for the damages inflicted by [the City's] application of the [Rent Control Law] to [SMB's] property, and the [Rent Control Law] contains no provision for seeking or obtaining compensation."

For each and all of these reasons, SMB alleges, the Board's application of the Rent Control Law to SMB's property "comprises a regulatory taking of [SMB's] property for public use without just compensation . . . . [¶] A trial de novo is necessary to examine the constitutional issues in this case. The administrative record compiled by the Rent Board is inadequate for this purpose because the Rent Board does not conduct the kind of judicial proceedings needed to safeguard [SMB's] fundamental right to due process of law or its right not to be deprived of its property without just compensation. . . ."

SMB's petition for a writ of administrative mandate alleges that the Board acted without or in excess of its jurisdiction under the Rent Control Law and that the Board's actions frustrated its ability to obtain a fair return from its rental property.

The Board demurred to the claim for inverse condemnation, contending that, as a matter of law, SMB could not prevail because there was a "rational basis" for the Rent Control Law. The trial court agreed and sustained the demurrer without leave to amend, leaving the administrative mandate petition to be heard at a later date. SMB filed a petition for a writ of mandate with the Court of Appeal, claiming the inverse condemnation action was inextricably related to its administrative mandate, and that the demurrer had been wrongly sustained.

The Court of Appeal issued an order to show cause and subsequently set aside the trial court's judgment. It agreed with SMB that a heightened standard of scrutiny applied to Rent Control Law under *Nollan* v. *California Coastal Comm'n* (1987) 483 U.S. 825 [107 S.Ct. 3141, 97 L.Ed.2d 677] (*Nollan*), and, if the allegations were true, that the Rent Control Law's failure to meet its stated purposes meant that it failed to substantially advance a legitimate government purpose, and was therefore a taking of property. The court made clear, however, that in its view even under a more deferential "rational basis" test, the rent control ordinance would fail. "If, in fact, [the Rent Control Law] has reduced rather than increased the number of rental units available to those intended to be benefited by that law, then the regulation has no relationship (nexus) at all to its stated purpose. Deference to legislative authority cannot salvage a regulation that defeats rather than accomplishes its stated purpose."

We granted review and initially deferred briefing pending resolution of another case involving the Rent Control Law, *Kavanau* v. *Santa Monica Rent Control Bd.* (1997) 16 Cal.4th 761 [66 Cal.Rptr.2d 672, 941 P.2d 851]. That case, however, did not directly address the novel constitutional theory advanced by SMB and accepted by the Court of Appeal. We ordered further briefing to determine the merits of SMB's constitutional claim.

## II. Discussion

### A. *Statute of Limitations*

We begin by addressing the Board's contention that SMB's challenge to the imposition of the Rent Control Law is actually a facial challenge, and therefore barred by the statute of limitations. (See *Sandpiper Mobile Village* v. *City of Carpinteria* (1992) 10 Cal.App.4th 542, 549 [12 Cal.Rptr.2d 623] [holding there is a five-year statute of limitation for real property takings challenges].) SMB contends, on the other hand, that its inverse condemnation action is an "as applied" challenge, and is timely brought. Generally, "[a] facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual." (*Tobe* v. *City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 [40 Cal.Rptr.2d 402, 892 P.2d 1145].) On the other hand, "[a]n as applied challenge may seek . . . relief from a specific application of a facially valid statute or ordinance to an individual or class of individuals who are under allegedly impermissible present restraint or disability as a result of the manner or circumstances in which the statute or ordinance has been applied . . . ." (*Ibid.*) In the case of rent control laws, facial challenges have been used to invalidate structural features of the law that are inherently confiscatory, i.e., that fail to permit a landlord a fair rate of return. (See, e.g., *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 169 [130 Cal.Rptr. 465, 550 P.2d 1001] (*Birkenfeld*) [inadequate mechanism for adjusting base rents renders rent control charter amendment partially facially unconstitutional].) An "as applied" challenge is typically based on a showing that the application of the ordinance has left a particular landlord without the ability to earn a fair return. (See, e.g., *Kavanau* v. *Santa Monica Rent Control Bd., supra,* 16 Cal.4th at pp. 777-779 (*Kavanau*).)

We recognize that SMB's unusual claim bears resemblance in a number of respects to a facial challenge—it seeks to invalidate the Rent Control Law, not merely its application against one landlord. Nonetheless, for present purposes, our concern is not to label SMB's claim but to determine whether it is barred by the statute of limitations. Because SMB contends that its claim is derived from events occurring *after* the passage of the Rent Control Law,

we will proceed to the merits of its claim. In so doing, we leave aside for the moment the problem of determining precisely when SMB's inverse condemnation claim accrued.[1]

## B. *The Inverse Condemnation Claim*

■ We begin by recognizing the well-established case law of the United States Supreme Court and of this court holding that ordinary rent control statutes are generally constitutionally permissible exercises of governmental authority. In *Pennell* v. *City of San Jose* (1988) 485 U.S. 1 [108 S.Ct. 849, 99 L.Ed.2d 1] (*Pennell*), the court stated: "[W]e have 'consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails.' [Citations.] . . . '[S]tatutes regulating the economic relations of landlords and tenants are not *per se* takings.' [Citation.] Despite *amici's* urging, we see no need to reconsider the constitutionality of rent control *per se.*" (*Id.* at p. 12, fn. 6 [108 S.Ct. at pp. 857-858]; see also *Birkenfeld, supra,* 17 Cal.3d at p. 165.)

Many have questioned the wisdom of rent control, and no consensus exists as to whether it is good public policy. (See, e.g., Epstein, *Rent Control and the Theory of Efficient Regulation* (1989) 54 Brook. L.Rev. 741, and various responses on pp. 1215-1304 of the same journal.) We emphasize that a decision affirming the constitutionality of a particular rent control law is not in any sense an endorsement of its soundness. (See *Birkenfeld, supra,* 17 Cal.3d at p. 159.) ■ "Courts have nothing to do with the wisdom of laws or regulations, and the legislative power must be upheld unless manifestly abused so as to infringe on constitutional guaranties. The duty to uphold the legislative power is as much the duty of appellate courts as it is of trial courts, and under the doctrine of separation of powers neither the trial nor appellate courts are authorized to 'review' legislative determinations. The only function of the court is to determine whether the exercise of legislative power has exceeded constitutional limitations." (*Lockard* v. *City of Los Angeles* (1949) 33 Cal.2d 453, 461-462 [202 P.2d 38, 7 A.L.R.2d 990].)

■ We also emphasize that both the enactment and administration of rent control laws are subject to a number of constitutional constraints. Particular decisions of public agencies charged with administering rent

---

[1]The Board requests that we take judicial notice of the administrative record in this case, primarily to establish that the present action was brought 12 years after the enactment of the Rent Control Law. Because the timing of the suit is not directly relevant to the issues presented in this case, we decline to grant the request.

control may be deemed to be unconstitutional if as a result landlords are deprived of a fair rate of return. (*Kavanau, supra,* 16 Cal.4th at p. 778.) Moreover, we have recognized that rent control laws must possess certain structural features that safeguard against confiscatory results: "For example, due to the effects of inflation, the law 'may not indefinitely *freeze* the dollar amount of . . . profits without eventually causing confiscatory results.' [Citation.] In addition, when a rent control law establishes a 'base rent' by reference to rents on a specified date, the law should permit adjustments of that base rent for those rental units that had artificially low rents at that time. [Citation.] Similarly, the law should permit individualized rent adjustments in appropriate cases even if base rent was not artificially low [citation], and the procedural mechanism by which landlords may obtain any of these adjustments must not be prohibitively burdensome [citations]. Among other things, this process may not entail 'a substantially greater incidence and degree of delay than is practically necessary.' [Citations.] In this regard, we recommended that the law permit 'general rental adjustments for all or any class of rental units based on generally applicable factors.' [Citations.]" (*Kavanau, supra,* 16 Cal.4th at p. 772.) We accordingly have invalidated part of a rent control law for failing to provide adequate mechanisms for expeditious adjustments of base rents. (*Birkenfeld, supra,* 17 Cal.3d at p. 169.) We note that in its administrative mandamus action, SMB contends that the Rent Control Law has deprived it of a fair return on its property, and it remains free to pursue that claim.

 SMB's inverse condemnation claim, however, is not based on the ground that the Rent Control Law is confiscatory, either structurally or as administratively applied. Rather, SMB alleges that it can show, through the use of census data, that the demographic groups that the Rent Control Law was allegedly supposed to favor have not in fact benefited from it.[2] The notion that a court may invalidate legislation that it finds, after a trial, to have failed to live up to expectations, is indeed novel. In our constitutional system, it is generally assumed that only the legislative body that enacted the statute may exercise a power of repeal if that statute fails to meet legislative

[2]SMB in its briefing to this court argues for the first time that the broad constitutional issue of the validity of the Rent Control Law itself is not before us and that the inverse condemnation claim cannot be decided without a detailed case-specific factual inquiry. Yet the very nature of SMB's inverse condemnation claim, and the manner in which SMB chose to litigate it in the superior court and the Court of Appeal, raises the broader constitutional issue. SMB does not allege with any particularity in its inverse condemnation claim that the Board's decisions denied it a fair return, reserving such allegation for the administrative mandamus action, which is not before us. It is the larger constitutional issue of the role of the judiciary in determining whether a rent control law sufficiently advances a government interest to maintain its constitutional validity that is the crux of SMB's inverse condemnation claim, and resolution of this issue was the basis of the Court of Appeal's holding and our grant of review. It is this claim that we now address.

expectations. (See, e.g., *Ryan* v. *Johnson* (3d Cir. 1997) 115 F.3d 193, 200 [despite court's personal views on shortcoming of statute, it is "the singular role of Congress to amend or repeal [a] . . . statute"].)

SMB's claim is based on its reading of relatively recent United States Supreme Court case law in the area of takings jurisprudence. Before examining its claim in more detail, we first state the basic principles to emerge from this body of law. ▮ In determining whether a government regulation of property works a taking of property under the Fifth Amendment to the United States Constitution, the United States Supreme Court has generally eschewed any "set formula" for determining whether a taking has occurred, preferring to engage in " 'essentially ad hoc, factual inquiries' " (*Lucas* v. *South Carolina Coastal Council* (1992) 505 U.S. 1003, 1015 [112 S.Ct. 2886, 2893, 120 L.Ed.2d 798]), which focus in large part on the economic impact of the regulation (see *Penn Central Transp. Co.* v. *New York City* (1978) 438 U.S. 104, 124 [98 S.Ct. 2646, 2659, 57 L.Ed.2d 631]; *Keystone Bituminous Coal Assn.* v. *DeBenedictis* (1987) 480 U.S. 470, 493-501 [107 S.Ct. 1232, 1246-1250, 94 L.Ed.2d 472]). In the context of rent control and other price controls, this impact analysis takes the form of analyzing whether the regulation impairs "investors' ability to earn a fair return." (*Kavanau, supra,* 16 Cal.4th at p. 776.) Other than this ad hoc inquiry, the court has held categorically that property is taken when a government regulation "compel[s] [a] property owner to suffer a physical 'invasion' of his property" or "denies all economically beneficial or productive use of land." (*Lucas, supra,* 505 U.S. at pp. 1015-1016 [112 S.Ct. at p. 2893].) ▮ The court has also stated that "the Fifth Amendment is violated when a land-use regulation 'does not substantially advance legitimate state interests' " (*Lucas, supra,* 505 U.S. at p. 1016 [112 S.Ct. at p. 2894].) It is this last prong of the United States Supreme Court's "taking" standard that SMB claims has been violated.

In *Nollan, supra,* 483 U.S. 825, 834 [107 S.Ct. 3141, 3147], the court discussed this "substantially advance" test in the context of a governmental requirement that a property owner dedicate a portion of its property to the public as a condition for obtaining a development permit: "Our cases have not elaborated on the standards for determining what constitutes a 'legitimate state interest' or what type of connection between the regulation and the state interest satisfies the requirement that the former substantially advance the latter. They have made clear, however, that a broad range of governmental purposes and regulations satisfies these requirements." (Fn. omitted.) The court further noted that the "substantially advance" standard is different from the rational basis standard employed in the fields of equal protection and due process. (*Id.* at p. 834, fn. 3 [107 S.Ct. at p. 3147].) The

court also declared toward the end of its opinion: "As indicated earlier, our cases describe the condition for abridgment of property rights through the police power as a '*substantial* advanc[ing]' of a legitimate state interest. We are inclined to be particularly careful about the adjective where the actual conveyance of property is made a condition to the lifting of a land-use restriction, since in that context there is heightened risk that the purpose is avoidance of the compensation requirement, rather than the stated police-power objective." (*Id.* at p. 841 [107 S.Ct. at pp. 3150-3151].)

This standard was further elucidated in *Dolan* v. *City of Tigard* (1994) 512 U.S. 374 [114 S.Ct. 2309, 129 L.Ed.2d 304] (*Dolan*), a case that also concerned required dedications of property as a condition for granting a development permit. The court concluded that a "rough proportionality" standard "best encapsulates what we hold to be the requirement of the Fifth Amendment. No precise mathematical calculation is required, but the city must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." (*Id.* at p. 391 [114 S.Ct. at pp. 2319-2320], fn. omitted.)

The *Dolan* court once again emphasized that conveyances such as were considered in that case were deserving of a greater scrutiny than other land use restrictions. Typical land use regulations such as zoning ordinances "differ in two relevant particulars from the present case. First, they involve essentially legislative determinations classifying entire areas of the city, whereas here the city made an adjudicative decision to condition petitioner's application for a building permit on an individual parcel. Second, the conditions imposed were not simply a limitation on the use petitioner might make of her own parcel, but a requirement that she deed portions of the property to the city. . . . Under the well-settled doctrine of 'unconstitutional conditions,' the government may not require a person to give up a constitutional right—here the right to receive just compensation when property is taken for public use—in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the property." (512 U.S. at p. 385 [114 S.Ct. at pp. 2316-2317].) The court further stated in the course of responding to the dissent: "Justice Stevens' dissent takes us to task for placing the burden on the city to justify the required dedication. He is correct in arguing that in evaluating most generally applicable zoning regulations, the burden properly rests on the party challenging the regulation to prove that it constitutes an *arbitrary regulation of property rights*. [Citation.] Here, by contrast, the city made an adjudicative decision to condition petitioner's application for a building permit on an individual parcel. In this situation, the burden properly rests on the city." (*Id.* at p. 391, fn. 8 [114 S.Ct. at p. 2320], italics added.)

From the above, it can be inferred that the "substantially advance" standard in the takings context is applied differently depending on the type of government action under consideration. As *Nollan* and *Dolan* both attest, government requirements that property owners dedicate land as a condition of receiving a development permit will receive the highest scrutiny—a type of intermediate scrutiny in which a government's dedication requirements will pass constitutional muster as long as the government "make[s] some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." (*Dolan, supra,* 512 U.S. at p. 391 [114 S.Ct. at pp. 2319-2320], fn. omitted.) Moreover, although the above formulation in *Dolan* cannot be readily transplanted outside the context of exactions, we have long held that adjudicative land use decisions in general must be justified by factual findings supported by substantial evidence in an administrative record. (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 514-516 [113 Cal.Rptr. 836, 522 P.2d 12].) The most deferential review of land use decisions appears to be for those that pertain to "essentially legislative determinations" that do not require any physical conveyance of property. A challenger to the validity of a legislative determination, such as a zoning regulation, bears the burden of proving that the regulation "constitutes an arbitrary regulation of property rights." (*Dolan, supra,* 512 U.S. at p. 391, fn. 8 [114 S.Ct. at p. 2320]; see also *Corona-Norco Unified School Dist.* v. *City of Corona* (1993) 17 Cal.App.4th 985, 992 [21 Cal.Rptr.2d 803] [judicial review of quasi-legislative acts of local agencies by ordinary mandamus is limited to "whether the action was arbitrary, capricious or entirely lacking in evidentiary support"].)

We recognized these different levels of takings scrutiny in *Ehrlich* v. *City of Culver City* (1996) 12 Cal.4th 854 [50 Cal.Rptr.2d 242, 911 P.2d 429] (*Ehrlich*). We rejected the claim that the *Nollan* and *Dolan* standards do not apply to development fees imposed on an individualized basis as a condition for development. "In our view, the intermediate standard of judicial scrutiny formulated by the high court in *Nollan* and *Dolan* is intended to address just such . . . land use 'bargains' between property owners and regulatory bodies—those in which the local government conditions permit approval for a given use on the owner's surrender of benefits which *purportedly* offset the impact of the proposed development." (12 Cal.4th at p. 868.) But a different standard of scrutiny would apply to development fees that are generally applicable through legislative action "because the heightened risk of the 'extortionate' use of the police power to exact unconstitutional conditions is not present." (*Id.* at p. 876; see also *id.* at p. 897 (conc. opn. of Mosk, J.); *id.* at p. 903 (conc. and dis. opn. of Kennard, J.).) Thus, individualized development fees warrant a type of review akin to the conditional

conveyances at issue in *Nollan* and *Dolan*, whereas generally applicable development fees warrant the more deferential review that the *Dolan* court recognized is generally accorded to legislative determinations. (*Dolan, supra,* 512 U.S. at p. 391, fn. 8 [114 S.Ct. at p. 2320].)

Where does rent control fit within this scheme? It could be argued that rent control is essentially a species of price control rather than a land use regulation, and that the constitutional jurisprudence of price control governs ordinary rent control ordinances. (See *Hutton Park Gardens* v. *Town Council* (1975) 68 N.J. 543 [50 A.2d 1, 7-8]; see also *Birkenfeld, supra,* 17 Cal.3d at p. 157.) ■ Those challenging the constitutionality of a legislative scheme of price control must show that " 'no reasonably conceivable set of facts could establish a rational relationship between the regulation and the government's legitimate ends.' " (*20th Century Ins. Co.* v. *Garamendi* (1994) 8 Cal.4th 216, 292 [32 Cal.Rptr.2d 807, 878 P.2d 566].) A price control regulation is generally constitutionally challenged with the contention that a particular price or rate regulation is confiscatory, i.e., does not allow a just and reasonable rate to investors. (See, e.g., *20th Century Ins. Co., supra,* 8 Cal.4th at p. 293; *Duquesne Light Co.* v. *Barasch* (1989) 488 U.S. 299, 307-308 [109 S.Ct. 609, 615, 102 L.Ed.2d 646].) Thus, we recently stated that, "[i]n the context of price control, which includes rent control, courts generally find that a regulation bears 'a reasonable relation to a proper legislative purpose' so long as the law does not deprive investors of a 'fair return' and thereby become 'confiscatory.' [Citations.]" (*Kavanau, supra,* 16 Cal.4th at p. 771.) As we also noted in *Kavanau* and *20th Century Ins. Co.,* courts have employed this fair return analysis in price regulation cases whether the contested regulation is denominated as a taking or a deprivation of property without due process. (*Kavanau, supra,* 16 Cal.4th at pp. 776-777; *20th Century Ins. Co., supra,* 8 Cal.4th at p. 292; see also *Duquesne Light Co., supra,* 488 U.S. at pp. 307-308 [109 S.Ct. at p. 615].)

■ We need not decide whether the standard of review for rent control legislation is identical to the rational relationship test employed in other price control schemes. In light of the analysis reviewed above, we believe it is clear at least that the heightened intermediate scrutiny standard articulated in *Nollan* and *Dolan* does not apply in this case. Rather, the standard of review for generally applicable rent control laws must be at least as deferential as for generally applicable zoning laws and other legislative land use controls. Thus, the party challenging rent control must show "that it constitutes an arbitrary regulation of property rights." (*Dolan, supra,* 512 U.S. at p. 391, fn. 8 [114 S.Ct. at p. 2320].) Moreover, as explained below, even if, as SMB contends, the heightened standard in *Nollan* and *Dolan* were applicable here, the trial court acted properly in sustaining the demurrer to SMB's complaint.

The two United States Supreme Court cases to address rent control in the "post-*Nollan*" era are consistent with the above analysis. In *Pennell, supra,* 485 U.S. 1, the court rejected a facial challenge to a city's rent control ordinance that contained "hardship to a tenant" as one factor to consider in determining whether to grant rent increases. (*Id.* at p. 4 [108 S.Ct. at p. 853].) The court stated, in rejecting a due process challenge to the law, that a " '[p]rice control [law] is "unconstitutional . . . if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt . . . ." ' " (*Id.* at p. 11 [108 S.Ct. at p. 857].)

The court also held that any takings challenge would be premature, because there was no showing of the actual impact of the "tenant hardship" provision of the San Jose ordinance. (*Pennell, supra,* 485 U.S. at pp. 10-11 [108 S.Ct. at p. 857].) Justice Scalia's dissent, like the majority, took for granted the basic constitutionality of ordinary rent control laws, and would have found the ordinance in question constitutional but for the tenant hardship factor which, in the dissent's view, unfairly imposed on landlords the solution to the "social problem" of having "some renters who are too poor to afford even reasonably priced housing." (*Id.* at p. 21 [108 S.Ct. at p. 862] (dis. opn. of Scalia, J.).) Neither the majority nor dissent suggested that some heightened standard was appropriate for reviewing ordinary rent control law.

In *Yee* v. *City of Escondido* (1992) 503 U.S. 519 [112 S.Ct. 1522, 118 L.Ed.2d 153], the court considered the constitutionality of a mobilehome rent control ordinance. As the court made clear at the outset, the case did not raise the issue of whether ordinary rent control laws violate the takings clause. (*Id.* at p. 526 [112 S.Ct. at p. 1527].) The mobilehome ordinance in question had several features that distinguished it from ordinary rent control—a restriction on the ability of the landlord to exit from the mobilehome rental business, and a provision that a mobilehome park tenant had the right to sell his rental to others, without the landlord's consent. The effect of such a regulatory scheme was allegedly to permit existing tenants to appropriate all the savings that result from rent control, rather than, as in the case of ordinary rent control, having those savings be distributed among both present and future tenants. (*Id.* at p. 530 [112 S.Ct. at p. 1530].) The issue before the *Yee* court was whether such a regulatory scheme constituted a *physical* taking of property, and the court determined that it did not. (*Id.* at p. 532 [112 S.Ct. at pp. 1530-1531].) The court stated in dictum that the peculiar features of this type of rent control law might "have some bearing on whether the ordinance causes a *regulatory* taking, as it may shed some light on whether there is a sufficient nexus between the effect of the ordinance and the objectives it is supposed to advance." (*Id.* at p. 530 [112

S.Ct. at p. 1530].) Thus, the court's dictum suggested that the mobilehome rent control scheme of regulation would be scrutinized to determine whether those restrictive regulations advanced a legitimate government interest. The opinion did not suggest that such restrictions were unconstitutional, nor did it elaborate upon the "substantially advance" standard in this context. Still less did it hold or imply that in the case of ordinary rent control, there was a new, heightened standard of review.

With this background in mind we turn to the present case. SMB's complaint focuses on certain of the stated goals of rent control found in the preamble to the charter amendment—providing affordable housing for the poor, the elderly, and young families—and has alleged that rent control has failed to achieve these goals. As will appear below, these allegations, even if true, do not adequately state an inverse condemnation claim.

As the United States Supreme Court affirmed in *Nollan*, "a broad range of governmental purposes and regulations" are constitutionally valid under the takings clause. (*Nollan, supra,* 483 U.S. at pp. 834-835 [107 S.Ct. at p. 3147].) One of the purposes that the court has explicitly recognized as valid after *Nollan* is that of " 'prevent[ing] excessive and unreasonable rent increases' caused by the 'growing shortage of and increasing demand for housing' " within a municipality. (*Pennell, supra,* 485 U.S. at p. 12 [108 S.Ct. at p. 857].) SMB does not allege that the Santa Monica Rent Control Law fails to advance the purpose of "preventing excessive and unreasonable rent increases caused by the . . . shortage of and increased demand for housing" in the City or that existing tenants have not obtained protection from excessive or unreasonable rent increases. Therefore, even if we assume that some sort of intermediate judicial scrutiny, patterned after the *Nollan* and *Dolan* cases, were applicable to judicial review of rent control, SMB's complaint does not adequately allege that the Rent Control Law fails to substantially advance *some* legitimate state purpose.

SMB contends essentially that in considering the legitimate purposes of the Rent Control Law, we must confine ourselves to the stated purposes of that law. But even if that were true, there is no justification for SMB's truncated reading of the law's purposes. The charter amendment spoke of a housing shortage "resulting in a low vacancy rate and rapidly rising rents . . . affecting the lives of a substantial portion of those Santa Monica residents residing in residential housing. In addition, speculation in the purchase and sale of existing residential housing units results in further rent increases. These conditions endanger the public health and welfare of *Santa Monica tenants*, especially the poor, minorities, students, young families, and senior citizens. *The purpose of this Article*, therefore, is to alleviate the

hardship caused by this serious housing shortage by establishing a Rent Control Board empowered *to regulate rentals in the City of Santa Monica so that rents will not be increased unreasonably and so that landlords will receive no more than a fair return.*" (Italics added.) We agree with the Ninth Circuit Court of Appeals, which, in rejecting an almost identical challenge to Santa Monica's Rent Control Law, stated: "[Plaintiff] contends that the Rent Control Law does not 'substantially advance' its purpose, which she misperceives as only to help the poor, elderly, minorities, and families with children. The Rent Control Law's stated purpose is to help *all* Santa Monica tenants, not just those within the mentioned groups, and not those who wish to become tenants there. [Citation.] Controlling rents to a reasonable level and limiting evictions substantially alleviate hardships to Santa Monica tenants. That rent control may unduly disadvantage others, or that it may exert adverse long-term effects on the housing market, are matters for political argument and resolution; they do not affect the constitutionality of the Rent Control Law." (*Schnuck* v. *City of Santa Monica* (9th Cir. 1991) 935 F.2d 171, 175, italics in original, fns. omitted.)

■ Moreover, there is no constitutional requirement that the inquiry into whether the legislation substantially serves legitimate goals must be limited to stated goals, much less to only some of the stated goals. "Legislative bodies have broad scope to experiment with economic problems . . . ." (*Ferguson* v. *Skrupa* (1962) 372 U.S. 726, 730 [83 S.Ct. 1028, 1031, 10 L.Ed.2d 93, 95 A.L.R.2d 1347].) It appears elementary that any complex piece of social or economic legislation will often have unanticipated consequences that can be both beneficial and detrimental, and that the legislative body or the electorate that enacted the legislation must be entrusted to weigh *whatever* harms and benefits result from the legislation in determining whether that legislation should be amended or abrogated. There is simply no authority for the proposition that a piece of legislation that advances legitimate goals, but not precisely those goals specified in its preamble, may be struck down by a court as unconstitutional.

■ Accordingly, the prevention of " 'excessive and unreasonable rent increases' caused by the 'growing shortage of and increasing demand for housing' " in the City (*Pennell, supra,* 485 U.S. at p. 12 [108 S.Ct. at p. 857]) is a legitimate government interest whether or not that goal is precisely identified in the text of the law's preamble and whether the primary beneficiaries of such protection are tenants with low or merely moderate income. The assistance of moderate-income households with their housing needs is recognized in this state as a legitimate governmental purpose. (See, e.g., Gov. Code, § 65583, subd. (c)(2) [local communities must set forth in housing elements of their general plan a program that will "assist in the

development of adequate housing to meet the needs of low- *and moderate-income households*" (italics added)].) Nor does SMB allege that *no* poor, minority or elderly tenants have benefited from rent control, only that they did not benefit as much as a class in the City as they did in other locales that did not have rent control. Thus, the complaint does not allege that even the limited goals identified by SMB have been completely frustrated.

Moreover, a rent control law, even if imperfect, may protect existing tenants, including the poor and elderly, from being displaced due to rising rents in a tight rental market. As the Supreme Court stated in upholding article XIII A of the California Constitution (Proposition 13) against an equal protection challenge brought by property owners who objected to the greatly disparate property tax burdens that provision had created: "[T]he State has a legitimate interest in local neighborhood preservation, continuity, and stability. [Citation.] The State therefore legitimately can decide to structure its tax system to discourage rapid turnover in ownership of homes and businesses, for example, in order to inhibit displacement of lower income families by the forces of gentrification . . . ." (*Nordlinger* v. *Hahn* (1992) 505 U.S. 1, 12 [112 S.Ct. 2326, 2332-2333, 120 L.Ed.2d 1].) So too, a legitimate goal of rent control may be to stabilize communities in much the same way, by preventing sharply escalating rents from forcing tenants to move (see Berger, *Home Is Where the Heart Is: A Brief Reply to Professor Epstein* (1989) 54 Brook. L.Rev. 1239), even if its benefits are not limited to targeted demographic groups.

SMB purports to find support for its position that the legislation must be measured against stated purposes from the statement in *Nollan, supra,* 483 U.S. at page 834, footnote 3 [107 S.Ct. at page 3147]: "Contrary to [the dissent's] claim, . . . our opinions do not establish that these [takings] standards are the same as those applied to due process or equal protection claims. To the contrary, our verbal formulations in the takings field have generally been quite different. We have required that the regulation 'substantially advance' the 'legitimate state interest' sought to be achieved [citation], not that 'the State "could *rationally have decided*" that the measure adopted might achieve the State's objective.' " The *Nollan* court also noted that in the development permit/dedication context, there is the "heightened risk that the purpose is avoidance of the compensation requirement, rather than the *stated* police-power objective." (*Id.* at p. 841 [107 S.Ct. at p. 3151], italics added.) But these statements do not aid SMB. As discussed, the Rent Control Law has the broad stated purpose of "alleviat[ing] the hardship caused by th[e] serious housing shortage" in the City for the general benefit of tenants, and SMB does not allege that it has failed to do so.

Furthermore, *Nollan* implies, and *Dolan* more explicitly states, that the standard of review for land use *legislation* is different from the standard of

review when the court considers a property dedication in exchange for a development permit—a particular type of *adjudicative* determination. It is one thing for courts to make a government agency adhere to its own justification for requiring the dedication of a particular portion of property as a condition of development; such adherence safeguards against the possibility that the justification is merely a pretext for taking the property without paying compensation. (See *Nollan, supra,* 483 U.S. at p. 841 [107 S.Ct. at p. 3151]; *Ehrlich, supra,* 12 Cal.4th at p. 868.) Holding agencies to their stated goals in these instances is also consistent with our state law requirement that adjudicative or administrative decisions be based on findings supported by substantial evidence in the record. (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d at pp. 515-516.) But it is another thing for courts to require that a complex, generally applicable piece of economic legislation that will have many effects on many different persons and entities accomplish precisely the goals stated in a legislative preamble in order to preserve its constitutionality. Rather, as discussed, such legislation may not be invalidated under the "substantially advance" prong of takings analysis unless it "constitutes an arbitrary regulation of property rights." (*Dolan, supra,* 512 U.S. at p. 391, fn. 8 [114 S.Ct. at p. 2320].) Thus, although we believe that SMB's complaint fails to state an inverse condemnation cause of action even under a heightened *Nollan/Dolan* type of standard, the complaint unquestionably fails under the more deferential takings standard appropriate for general legislation.

SMB cites *Chastleton Corporation* v. *Sinclair* (1924) 264 U.S. 543, 548 [44 S.Ct. 405, 406, 68 L.Ed. 841], for the proposition that government dissatisfaction with high rents "is not in itself a justification" for rent control. In that case, the court considered whether an emergency wartime rent control statute should be extended beyond the emergency period, and concluded that a factual question had been presented that required further adjudication. But as one court has stated, "*Chastleton* is a *Lochner*-era[3] case the validity of which is questionable at best." (*Traweek* v. *City and County of San Francisco* (N.D.Cal. 1984) 659 F.Supp. 1012, 1028, fn. 30.) As we explained at considerable length in *Birkenfeld, supra,* 17 Cal.3d at pages 153-160, an emergency housing shortage, such as may exist during wartime, is not a constitutional requisite for rent control. The modern view is "that a legitimate and rational goal of price or rate regulation is the protection of consumer welfare" (*Pennell, supra,* 485 U.S. at p. 13 [108 S.Ct. at p. 858]), irrespective of the existence of an emergency.

---

[3]The reference is to *Lochner* v. *New York* (1905) 198 U.S. 45 [25 S.Ct. 539, 49 L.Ed. 937], in which the court invalidated on due process grounds a law limiting the maximum hours bakers were permitted to work. This case has lent its name to the era in which the constitutional view the case typifies—invalidation of social and economic legislation on due process grounds if in the court's view there was insufficient justification for the law—prevailed. (See Tribe, American Constitutional Law (2d ed. 1988) § 8-4, pp. 570-573.)

Our adoption of SMB's position would not only be inconsistent with constitutional precedent, but would create formidable practical problems as well. How long would a court, or a litigant, have to wait to give the law a "fair chance" to work before declaring that it is a failure and therefore unconstitutional? There is no answer to this question that would not be arbitrary and would not put courts in a distinctively legislative role.

That is not to say that a change in conditions may never justify the constitutional invalidation of a once valid law. But the circumstances for such invalidation are quite narrow. A quintessential example is presented by *Skalko* v. *City of Sunnyvale* (1939) 14 Cal.2d 213 [93 P.2d 93]. In that case the plaintiff's property was zoned for residential use. Since the time of the zoning ordinance's enactment, a large cannery had been built about 100 feet from the property. The cannery greatly increased automobile and truck traffic adjacent to the property and caused an infestation of the prune trees on the property by insects drawn to the cannery. After the city denied the plaintiff's proposal that his lot be rezoned so that he could operate a cafeteria and refreshment stand, he sued for declaratory relief, claiming the zoning ordinance was invalid as applied to him. In upholding his position, this court stated: "Where conditions have changed since the legislative action was taken, 'statutes and ordinances which, after giving due weight to the new conditions, are found clearly not to conform to the Constitution, of course, must fall'." (*Id.* at p. 216.) As the court concluded: "Certainly no one wants to live next door to a large factory, and the question whether any consideration of public health, peace, safety or general welfare justifies the continued restriction upon the appellant's property which prohibits its use for commercial purposes is not fairly debatable." (*Ibid.*)

Thus, in *Skalko*, the court found changing conditions rendered the application of a zoning ordinance to a particular piece of property arbitrary and irrational. There is no comparable allegation in SMB's complaint. Rather, SMB seeks to engage courts in the task of evaluating whether a piece of complex legislation has sufficiently measured up to its objectives to preserve its constitutional validity. Nothing in the United States Supreme Court's recent jurisprudence indicates that it envisions such an activist role for the courts.[4]

In reversing the Court of Appeal, we again emphasize that we are not considering the question whether rent control is good policy but rather

---

[4]To be sure, there are circumstances in which some greater degree of judicial scrutiny of legislative factfinding is appropriate. This has been the case, for example, when there are fundamental constitutional rights at stake that can be curtailed only when the state demonstrates a compelling interest under the strictest judicial scrutiny. (See *American Academy of Pediatrics* v. *Lungren* (1997) 16 Cal.4th 307, 341, 349-350 [66 Cal.Rptr.2d 210, 940 P.2d 797] [greater scrutiny of legislative factfinding under the California Constitution's privacy clause for statute curbing the right to abortion]; *Turner Broadcasting System, Inc.* v. *FCC*

affirming the constitutional propriety of having the political process, through state and local legislative bodies, determine that policy. We note that the Legislature has already placed some limitation on rent control, enacting a statute restricting the capacity of localities to prevent landlords from charging the full market rent when a rental unit becomes vacant, and also preventing the imposition of rent control on certain types of units. (Civ. Code, §§ 1954.50-1954.53.) Thus, the legislative process has worked in a way that the blunt instrument of constitutional law generally cannot, crafting a political compromise that eliminates some of the perceived evils of rent control while preserving some of its benefits, i.e., to existing tenants.

In sum, with rent control, as with most other such social and economic legislation, we leave to legislative bodies rather than the courts to evaluate whether the legislation has fallen so far short of its goals as to warrant repeal or amendment. Courts, on the other hand, retain the constitutional role of invalidating certain features and applications of rent control law that have or will produce confiscatory results. (See *Kavanau, supra,* 16 Cal.4th 761; *Birkenfeld, supra,* 17 Cal.3d at p. 169.) In the present case, SMB remains free to proceed with its administrative mandamus action alleging that the Board exceeded its legal authority under the charter amendment and that the Board's rulings deprived SMB of a fair return.

---

(1994) 512 U.S. 622, 666 [114 S.Ct. 2445, 2471, 129 L.Ed.2d 497] [recognizing that when First Amendment rights are implicated, "deference afforded to legislative findings does 'not foreclose [a court's] independent judgment of the facts bearing on an issue of constitutional law' "].) We have also recognized that some state constitutional provisions that impose very specific constraints on governmental power require for their enforcement a certain degree of judicial scrutiny of legislative factfinding. Thus, in *Professional Engineers* v. *Department of Transportation* (1997) 15 Cal.4th 543, 569-570 [63 Cal.Rptr.2d 467, 936 P.2d 473], we considered article VII of the California Constitution, which has been construed to restrict the state's authority to privately contract for state services, subject to limited exceptions, such as when such contracting would result in cost savings. (15 Cal.4th at p. 550.) We upheld a trial court injunction against a certain form of private contracting by the Department of Transportation, in which the trial court had made a specific finding that no cost savings would result. We rejected a challenge to the injunction that relied on a statute passed subsequent to the injunction that asserted, without evident factual support, that the private contracting proscribed by the injunction would indeed result in cost savings. (*Id.* at pp. 572-574.)

The present case, regarding as it does the extent to which the government can regulate rent increases, does not involve the sort of fundamental right that is subject to the highest judicial scrutiny. (See *Pennell, supra,* 485 U.S. at p. 12 [108 S.Ct. at pp. 857-858].) Nor does it involve a constitutional provision construed to prohibit a certain type of government action absent specific factual findings, as was the case in *Professional Engineers.*

Moreover, as previously discussed, courts will scrutinize the *adjudicative* decisions of local legislative bodies on statutory and constitutional grounds to determine if their findings are supported by substantial evidence (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d at pp. 515-516) or, in the case of certain development permit decisions, whether the exactions required are roughly proportional to a legitimate governmental interest. (*Dolan, supra,* 512 U.S. at p. 39 [114 S.Ct. at pp. 2319-2320]). This type of scrutiny has generally not been applied to the *legislative* acts of local bodies. (See *Corona-Norco Unified School Dist.* v. *City of Corona, supra,* 17 Cal.App.4th at p. 992.)

### III. Disposition

For all of the foregoing, we reverse the judgment of the Court of Appeal and remand with directions to reinstate the judgment of the trial court.

George, C. J., Kennard, J., and Werdegar, J., concurred.

**KENNARD, J.,** Concurring.—The United States Constitution requires the government to pay just compensation when private property is taken for public use. (U.S. Const., 5th Amend.) One test for determining whether a property regulation effects a taking, which the United States Supreme Court first articulated about twenty years ago, is the following: Government action affecting the use of private property is a taking requiring just compensation if the action does not "substantially advance" a legitimate government purpose. (*Agins* v. *City of Tiburon* (1980) 447 U.S. 255, 260 [100 S.Ct. 2138, 2141, 65 L.Ed.2d 106].)

The "substantially advance" test is a means-end test: It requires that the property regulation in question—the means by which the government is acting—advance the end or purpose the government is seeking to achieve through the regulation. The question here is: How "substantially" must rent control, the regulation at issue here, "advance" the governmental purpose that justifies it? To answer this question, the majority opinion, in which I concur, uses what might be termed a "functional" approach, looking for guidance to cases judging the constitutionality of two functionally similar categories of regulation: price controls and general land use regulations. It concludes that rent control is valid unless it is an arbitrary regulation of property rights. (Maj. opn., *ante*, at p. 967.) I write separately to explain an additional basis for reaching this conclusion. An examination of the historical origins and development of the high court's "substantially advance" test shows that it originated outside of just compensation law in the realm of substantive due process and that, outside the narrow circumstances in which government exacts property as a condition of a development permit, the test is best understood as a rational relationship test.

### I

As I have noted elsewhere, courts have long struggled with the difficult question of how to determine whether a particular government action is a taking requiring compensation under the just compensation clause. (*Customer Co.* v. *City of Sacramento* (1995) 10 Cal.4th 368, 394 & fn. 1 [41 Cal.Rptr.2d 658, 895 P.2d 900] (conc. opn. of Kennard, J.).) And as I mentioned at the outset here, in the past 20 years the United States Supreme

Court has adopted the rule that government regulation of property is a taking if it fails to substantially advance a legitimate state interest.

The "substantially advance" test first entered just compensation law in 1980 in *Agins* v. *City of Tiburon, supra*, 447 U.S. 255, 260 [100 S.Ct. 2138, 2141] (hereafter *Agins*). In that case, the United States Supreme Court stated: "The application of a general zoning law to particular property effects a taking if the ordinance does not *substantially advance* legitimate state interests, see *Nectow* v. *Cambridge*, 277 U.S. 183, 188 (1928)[48 S.Ct. 447, 448, 72 L.Ed. 842], or denies an owner economically viable use of his land, see *Penn Central Transp. Co.* v. *New York City*, 438 U.S. 104, 138, n. 36 (1978) [98 S.Ct. 2646, 2666, 57 L.Ed.2d 631]." (*Ibid.,* italics added.) Two years earlier, the high court had foreshadowed this test by stating that "a use restriction on real property may constitute a 'taking' if not *reasonably necessary* to the effectuation of a substantial public purpose, see *Nectow* v. *Cambridge, supra.*" (*Penn Central Transp. Co.* v. *New York City* (1978) 438 U.S. 104, 127 [98 S.Ct. 2646, 2660-2661, 57 L.Ed.2d 631], italics added (hereafter *Penn Central*).)

More recently, in *Nollan* v. *California Coastal Comm'n* (1987) 483 U.S. 825 [107 S.Ct. 3141, 97 L.Ed.2d 677] (hereafter *Nollan*) and *Dolan* v. *City of Tigard* (1994) 512 U.S. 374 [114 S.Ct. 2309, 129 L.Ed.2d 304] (hereafter *Dolan*), the United States Supreme Court used the "substantially advance" language of *Agins* as the textual basis for developing unique requirements to be used in deciding whether an adjudicatively determined "exaction" of property as a condition of a property development permit was a taking. (Regulations affecting property can generally be classified as either legislative, if the restriction they impose applies to all property falling within a given class, or adjudicative, if the government through case-by-case decisionmaking makes an individualized determination of what restriction to impose on each particular piece of property.)

*Nollan* and *Dolan* were cases in which property owners seeking development permits were adjudicatively required by the permitting authority to dedicate property easements to the government as a condition of a development permit. (*Dolan, supra*, 512 U.S. at pp. 379-380 [114 S.Ct. at p. 2314]; *Nollan, supra*, 483 U.S. at p. 828 [107 S.Ct. at p. 3144].) The analysis in those cases began with the proposition that the development condition in question, if it had been imposed compulsorily by the government, would have been a taking requiring compensation. (*Dolan, supra*, 512 U.S. at p. 384 [114 S.Ct. at p. 2316] ["Without question, had the city simply required petitioner to dedicate a strip of land along Fanno Creek for public use, rather than conditioning the grant of her permit to redevelop her property on such

a dedication, a taking would have occurred."]; *Nollan, supra,* 483 U.S. at p. 831 [107 S.Ct. at p. 3145] ["Had California simply required the Nollans to make an easement across their beachfront available to the public on a permanent basis in order to increase public access to the beach, rather than conditioning their permit to rebuild their house on their agreeing to do so, we have no doubt there would have been a taking."].)

The exchange of development permission for exaction avoids being a per se taking only because technically it is voluntary. Some limit, however, is needed to ensure that the exchange is a fair one; otherwise, these exchanges would become a mechanism for the government to obtain property without paying for it—" 'an out-and-out plan of extortion.' " (*Nollan, supra,* 483 U.S. at p. 837 [107 S.Ct. at p. 3149].) The *Nollan* and *Dolan* decisions attempted to ensure the fairness of the exchange by creating a special form of means-end testing. The *Nollan/Dolan* test authorizes exactions without compensation only if the exaction has a nexus to the harm the development will cause and is roughly proportional to the harm. (*Dolan, supra,* 512 U.S. at pp. 386, 391 [114 S.Ct. at pp. 2317, 2319].)

Outside the *Nollan/Dolan* context, the United States Supreme Court has not yet had occasion to define how closely ends and means must be related for a government action to avoid being a taking. The rent control at issue here is outside the *Nollan/Dolan* context because it is a restriction on property use that is not imposed adjudicatively on only certain rental housing but instead is imposed legislatively on all rental housing in the municipality. Plaintiff landlord nonetheless seeks to have us extend the *Nollan/Dolan* test to rent control. In their dissents, Justices Chin and Baxter criticize the majority for rejecting that view, and they assert that the majority has inappropriately conflated due process analysis with takings analysis by adopting instead a "rational relationship" means-end test, a test commonly used in substantive due process analysis. Although the dissents' position is a plausible one if the words "substantially advance" are viewed in isolation, it collapses once the history of the "substantially advance" test is examined, for that test originated as a due process rational relationship test.

Before the United States Supreme Court's decisions in *Agins* and *Penn Central,* there had been no means-end test in just compensation law. As authority for applying a means-end test to determine whether there has been a taking, both cases cited *Nectow* v. *Cambridge* (1928) 277 U.S. 183 [48 S.Ct. 447, 72 L.Ed. 842] (hereafter *Nectow*). *Nectow,* however, was not a takings case in which the property owner sought just compensation, but a substantive due process case in which the property owner challenged a zoning ordinance as lacking any rational relationship to the public welfare

and sought invalidation of the ordinance. To understand the connection between the substantive due process means-end test used in *Nectow* and the United States Supreme Court's recent application of that test in just compensation law, it is necessary to examine the history of the high court's development of substantive due process means-end review.

## II

The United States Supreme Court in the late 19th and early 20th century was developing as one aspect of substantive due process its view—applicable to all exercises of state power depriving someone of life, liberty, or property—that due process required some reasonable relationship between the means chosen by government and the ends it seeks to achieve. As I noted earlier, the high court's 1928 decision in *Nectow, supra*, 277 U.S. 183, sets forth a substantive due process means-end test. That test has its origins in *Mugler* v. *Kansas* (1887) 123 U.S. 623, 661 [8 S.Ct. 273, 297, 31 L.Ed. 205], a case upholding a state's prohibition statute that rendered a brewery valueless. *Mugler* formulated the general substantive due process test of state action as follows: "If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no *real or substantial relation* to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution." (*Ibid.*, italics added.) The high court repeated the "substantial relation" requirement in later substantive due process decisions in which the plaintiff challenged the validity of various forms of state regulation. (See, e.g., *German Alliance Ins. Co.* v. *Hale* (1911) 219 U.S. 307, 316 [31 S.Ct. 246, 248, 55 L.Ed. 229] [regulation of fire insurance]; *Jacobson* v. *Massachusetts* (1905) 197 U.S. 11, 31 [25 S.Ct. 358, 363, 49 L.Ed. 643] [mandatory vaccination legislation]; *Booth* v. *Illinois* (1902) 184 U.S. 425, 429 [22 S.Ct. 425, 426-427, 46 L.Ed. 623] [prohibition of grain option contracts]; *Powell* v. *Pennsylvania* (1888) 127 U.S. 678, 684 [8 S.Ct. 992, 995, 32 L.Ed. 253] [regulation of oleomargarine].)

The United States Supreme Court used this substantive due process means-ends test, and the "substantial relation" language, to determine the validity of zoning regulations in due process cases, including *Nectow*, in which a property owner contended that the regulations were unreasonable and therefore invalid but made no claim that the regulations were a taking requiring just compensation. (*Cusack Co.* v. *City of Chicago* (1917) 242 U.S. 526, 531 [37 S.Ct. 190, 192, 61 L.Ed. 472]; *Euclid* v. *Ambler Co.* (1926) 272 U.S. 365, 395 [47 S.Ct. 114, 121, 71 L.Ed. 303]; *Gorieb* v. *Fox* (1927) 274 U.S. 603, 610 [47 S.Ct. 675, 677-678, 71 L.Ed. 1228, 53 A.L.R. 1210]; *Nectow, supra*, 277 U.S. 183, 188 [48 S.Ct. 447, 448].) In perhaps the most

famous of these early zoning cases, *Euclid* v. *Ambler Co.* (hereafter *Euclid*), the court stated: "[B]efore the ordinance can be declared unconstitutional [under the due process clause], [it must be found] that such provisions are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." (*Euclid*, *supra*, 272 U.S. at p. 395 [47 S.Ct. at p. 121].) *Euclid* thus equates a regulation that has "no substantial relation" to its ends with one that is "arbitrary and unreasonable" and therefore fails to satisfy the requirements of substantive due process. The portion of *Nectow* that *Agins* came to rely on many years later was a restatement of *Euclid*'s substantive due process means-end test: "The governmental power to interfere by zoning regulations with the general rights of the land owner by restricting the character of his use, is not unlimited, and other questions aside, such restriction cannot be imposed if it does not bear a substantial relation to the public health, safety, morals, or general welfare. *Euclid* v. *Ambler Co.*, *supra*, p. 395." (*Nectow*, *supra*, 277 U.S. at p. 188 [48 S.Ct. at p. 448].)

### III

Means-end testing has remained a cornerstone of substantive due process since the high court's 1928 decision in *Nectow*. In cases after *Nectow*, the court continued to use *Nectow*'s formulation as a general test of substantive due process review. In *Nebbia* v. *New York* (1934) 291 U.S. 502, 525 [54 S.Ct. 505, 510-511, 78 L.Ed. 940, 89 A.L.R. 1469], a price control case upholding price controls on milk, the court observed: "And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained."[1]

*Nectow*, and its predecessor *Euclid*, have continued to be understood as due process means-end relationship cases; more specifically, they have been consistently viewed as cases applying a rational relationship standard of due process review. (*Nashville, C. & St. L. Ry.* v. *Walters* (1935) 294 U.S. 405,

---

[1]Justice Chin's dissent perceives a conflict in meaning between the "substantially advance" test that *Agins* adopted from *Nectow* and the rational relationship test of *Nebbia* v. *New York*, *supra*, 291 U.S. 502. The conflict vanishes, however, when the historical origins of the "substantially advance" test are taken into account. Both tests spring from the same root of substantive due process means-end review and are almost identically phrased in *Nectow* and *Nebbia*. (Compare *Nectow*, *supra*, 277 U.S. 183, 187-188 [48 S.Ct. 447, 448] [due process requires that challenged law not be " 'a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare in its proper sense' "] with *Nebbia* v. *New York*, *supra*, 291 U.S. at p. 525 [54 S.Ct. at p. 511] [due process requires that "the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained"].)

415 [55 S.Ct. 486, 488, 79 L.Ed. 949] [describing *Nectow* as holding that "[t]he police power is subject to the constitutional limitation that it may not be exerted arbitrarily or unreasonably" (fn. omitted)]; *Arlington Heights* v. *Metropolitan Housing Corp.* (1977) 429 U.S. 252, 263 [97 S.Ct. 555, 562, 50 L.Ed.2d 450] [describing *Nectow* as recognizing a "right to be free of arbitrary or irrational zoning actions"]; *Moore* v. *East Cleveland* (1977) 431 U.S. 494, 498, fn. 6 [97 S.Ct. 1932, 1935, 52 L.Ed.2d 531] (plur. opn.) ["*Euclid* held that land-use regulations violate the Due Process Clause if they are 'clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.' 272 U.S., at 395. See *Nectow* v. *Cambridge*, 277 U.S. 183, 188 (1928). . . . [O]ur cases have not departed from the requirement that the government's chosen means must rationally further some legitimate state purpose."].)

In 1980, the high court in *Agins* imported the substantive due process means-end test of *Nectow* into just compensation law. Citing *Nectow*, the *Agins* court stated that a zoning law that did not "substantially advance legitimate state interests" was a taking requiring just compensation. (*Agins, supra,* 447 U.S. at p. 260 [100 S.Ct. at p. 2141]; see also *Penn Central, supra,* 438 U.S. at p. 127 [98 S.Ct. at pp. 2660-2661] ["[A] use restriction on real property may constitute a 'taking' if not *reasonably necessary* to the effectuation of a substantial public purpose, see *Nectow* v. *Cambridge, supra,* . . ." (Italics added.)].)

*Agins* applied as a rational relationship test the "substantially advance" test it derived from *Nectow*. In *Agins*, the State of California had a policy requiring cities to develop open space plans; in response, a city enacted an ordinance limiting use of the five-acre property in question to residential housing at a density of one house per acre. *Agins* concluded with little difficulty and without a searching examination that the ordinance substantially advanced the legitimate government goal of reducing the "ill effects of urbanization" (*Agins, supra,* 447 U.S. 255, 261 [100 S.Ct. 2138, 2142]); to demonstrate that the advancement would be substantial the court relied on the following: "The State of California has determined that the development of local open-space plans will discourage the 'premature and unnecessary conversion of open-space land to urban uses.'" (*Ibid.*) A legislative conclusion made at the state level that as a statewide matter open space planning will in general discourage urbanization may show that there is a rational relationship between the particular zoning restrictions imposed on the parcel at issue and the goal of "protect[ing] the residents of [the city] from the ill effects of urbanization" (*ibid.*), but does not establish any stronger connection than that between those ends and means.

In *Schad* v. *Mount Ephraim* (1981) 452 U.S. 61, 68 [101 S.Ct. 2176, 2182, 68 L.Ed.2d 671], the high court made clear that the *Agins* "substantially

advance" requirement is a rational relationship test: "Where property interests are adversely affected by zoning, the courts generally have emphasized the breadth of municipal power to control land use and have sustained the regulation if it is *rationally related* to legitimate state concerns and does not deprive the owner of economically viable use of his property. *Agins* v. *City of Tiburon*, 447 U.S. 255, 260 (1980); *Village of Belle Terre* v. *Boraas*, 416 U.S. 1 (1974) [94 S.Ct. 1536, 39 L.Ed.2d 797]; *Euclid* v. *Ambler Realty Co.*, 272 U.S. 365, 395 (1926). But an ordinance may fail even under that limited standard of review. *Moore* v. *East Cleveland, supra*, at 520 (Stevens, J., concurring in judgment); *Nectow* v. *Cambridge*, 277 U.S. 183 (1928)." (Italics added.)

Even apart from this historical understanding of the "substantially advance" test as a rational relationship test, plaintiff here has failed to give persuasive reasons for extending the heightened scrutiny of *Nollan* and *Dolan* to other forms of land use regulation, like the rent control at issue here, in which the government does not make an adjudicative decision to exact property as a condition of a development permit. There is good reason for using heightened means-end scrutiny in the *Nollan/Dolan* context because of the danger of government engaging in extortion by permit. But outside of that context, there is no clear justification for it as a general requirement of just compensation law. (See *Ehrlich* v. *City of Culver City* (1996) 12 Cal.4th 854, 903, 906-907 [50 Cal.Rptr.2d 242, 911 P.2d 429] (conc. and dis. opn. of Kennard, J.) [noting that *Nollan* and *Dolan* were limited to exactions of property adjudicatively imposed as a condition of development].)

## IV

As I have explained, outside the *Nollan/Dolan* context, I would adhere to the historical understanding of the "substantially advance" test as a rational relationship test. Nonetheless, as the differing positions held by members of this court in this case show, there are grounds for reasonable debate as to the meaning of that test in just compensation law outside the *Nollan/Dolan* context. Does it require only a rational relationship between the regulation and its purpose? Or a closer connection between means and ends, adapted from the *Nollan/Dolan* test? Or some other degree of connection between means and ends? I urge the high court to resolve this uncertainty.

This also raises a more fundamental question: Outside the *Nollan/Dolan* context, is a means-end test an appropriate measure of whether a regulatory taking has occurred? Means-end tests measure the degree to which the property regulation in question advances the purpose the government is seeking to achieve through the regulation. It may be questioned whether the

existence of a taking should depend on how well it advances the government's purpose for invading the property owner's interests. To the property owner, the loss is the same whatever the degree to which it advances the government's purpose. And although means-end testing can be used as an argument for expanding the right to compensation, as plaintiff does here, it could also restrict the right to compensation, for it suggests that if the regulation greatly advances the government's purpose, then no taking has occurred even if the invasion of the property owner's interest is also very great.

I note that recently Justice Kennedy of the United States Supreme Court has questioned the appropriateness of using a means-end test as the measure of whether a taking has occurred. (*Eastern Enterprises* v. *Apfel* (1998) 524 U.S. 498, __ [118 S.Ct. 2131, 2157, 141 L.Ed.2d 451] (conc. and dis. opn. of Kennedy, J.) ["The imprecision of our regulatory takings doctrine does open the door to normative considerations about the wisdom of government decisions. See, *e.g.*, *Agins v. City of Tiburon*, 447 U.S., at 260 . . . (zoning constitutes a taking if it does not 'substantially advance legitimate state interests'). This sort of analysis is in uneasy tension with our basic understanding of the Takings Clause, which has not been understood to be a substantive or absolute limit on Government's power to act. The Clause operates as a conditional limitation, permitting the Government to do what it wants so long as it pays the charge. . . . [¶] . . . [T]he more appropriate constitutional analysis [of the legitimacy of a legislative judgment that the means chosen will advance the government's purpose] arises under general due process principles rather than under the Takings Clause."]; see also *id.* at p. __ [118 S.Ct. at p. 2161] (dis. opn. of Breyer, J., joined by Stevens, Souter, and Ginsburg, JJ.) ["at the heart of the Clause lies a concern, not with preventing arbitrary or unfair government action, but with providing *compensation* for legitimate government action that takes 'private property' " (italics original)]; *First Lutheran Church* v. *Los Angeles County* (1987) 482 U.S. 304, 315 [107 S.Ct. 2378, 2386, 96 L.Ed.2d 250] [purpose of just compensation clause is "not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking" (italics original)].)

Commentators have likewise questioned the high court's incorporation of due process means-end testing in just compensation law. (Echeverria & Dennis, *The Takings Issue and the Due Process Clause: A Way Out of a Doctrinal Confusion* (1993) 17 Vt. L.Rev. 695.) Outside the *Nollan/Dolan* context, should a means-end test be used to determine whether a taking has occurred, or instead should means-end testing remain within due process jurisprudence? Only the high court can resolve this question and, given the

importance of this area of the law, I respectfully suggest that it do so when the opportunity next arises.

**BAXTER, J.**—I respectfully dissent.

The majority err in holding that the complaint in this case does not state a cause of action for inverse condemnation. The error results in part from the mistaken notion that the separation of powers doctrine somehow precludes the plaintiff from introducing evidence in support of its takings clause claim that the stated purpose of the Santa Monica rent control ordinance[1] has not been substantially advanced over time. In the end, the majority refuse to direct the court below to carry out its constitutionally mandated judicial obligation to determine, on the basis of evidence to be presented, whether application of the Santa Monica ordinance has taken property from plaintiff without just compensation.

In so doing, the majority address the wrong question, arrive at the wrong answer, and fail to differentiate between the distinct judicial roles of assessing the validity of the ordinance against a claim that it violates substantive due process and in determining whether the impact of the ordinance constitutes a taking of private property for which just compensation must be paid. In short, I agree wholeheartedly with Justice Chin's conclusion that the majority "inappropriately conflates takings jurisprudence with due process jurisprudence." (Dis. opn. of Chin, J., *post*, at p. 1018.) As a result they not only deny plaintiff the opportunity to present evidence necessary to support its inverse condemnation claim, but also leave California takings jurisprudence in a state of confusion.

A statute may be a proper exercise of the police power and yet create a taking for which just compensation must be paid under the takings clause of the Fifth Amendment to the United States Constitution.[2] Although deference is accorded legislative judgment when a statute is challenged as exceeding the permissible scope of the police power, no question of deference or, as stated otherwise by the majority, level of judicial scrutiny arises when just compensation is sought under the takings clause, because a takings claim presents " 'essentially ad hoc, factual inquiries.' " (*Hodel* v. *Virginia Surface*

---

[1] Rent control in Santa Monica is imposed under article XVIII, an amendment to the Santa Monica City Charter. Because article XVIII has the effect of a city ordinance, that term is used here for convenience.

[2] As relevant here, the Fifth Amendment provides that no person shall "be deprived of . . . property, without due process of law; nor shall private property be taken for public use without just compensation." The latter provision is commonly referred to as the "takings clause."

*Mining & Recl. Assn.* (1981) 452 U.S. 264, 295-296 [101 S.Ct. 2352, 2370, 69 L.Ed.2d 1]; *Kaiser Aetna* v. *United States* (1979) 444 U.S. 164, 175 [100 S.Ct. 383, 390, 62 L.Ed.2d 332].)

The Supreme Court has consistently recognized the distinct nature of the due process and takings clause inquiries. "[H]owever 'rational' the exercise of the [police] power may be, that inquiry is quite separate from the question [of] whether the enactment takes property within the prohibition of the Fifth Amendment." (*United States* v. *Security Industrial Bank* (1982) 459 U.S. 70, 75 [103 S.Ct. 407, 410-411, 74 L.Ed.2d 235]; see also *Eastern Enterprises* v. *Apfel* (1998) 524 U.S. 498 [118 S.Ct. 2131, 2161, 141 L.Ed.2d 451] (dis. opn. of Breyer, J.) [The takings clause "refers to the taking of 'private property . . . for public use without just compensation.' U.S. Const., Amdt. 5. As this language suggests, at the heart of the Clause lies a concern, not with preventing arbitrary or unfair government action, but with providing *compensation* for legitimate government action that takes 'private property' to serve the 'public good.' "].)

Failure to recognize this distinction fuels the majority's effort to ascertain what deference to accord to, or the level of judicial scrutiny to apply to, the Santa Monica rent control ordinance. That effort is misguided, for, as I explain below, the question of deference and/or level of judicial scrutiny simply does not arise in this takings clause claim.

As also will be discussed at greater length below, the majority's reasoning rests on a series of faulty premises:

(1) That plaintiff seeks to invalidate the Santa Monica rent control ordinance. It does not. The complaint seeks a declaration that the ordinance effects an uncompensated taking of plaintiff's property rights and seeks *monetary compensation for the taking. If a taking is found, compensation is due even if the ordinance is valid.*

(2) That recognizing a right to just compensation because the ordinance does not substantially advance its stated purpose would constitute a judicial repeal of the ordinance. Recognition that the imposition of rent controls on plaintiff's property is a taking and awarding compensation therefor would not repeal the ordinance. It would instead constitute a proper exercise of a judicial power recognized since the decision of *Marbury* v. *Madison* (1803) 5 U.S. (1 Cranch) 137 [2 L.Ed. 15]—the power to construe, apply, and enforce rights guaranteed to all citizens by the United States Constitution.

(3) That a takings clause claim for inverse condemnation may be rejected because the rent control ordinance has a rational basis and is not arbitrary and discriminatory. As Justice Chin observes, a takings clause claim for just compensation may not be rejected on that ground, which is an aspect of due process, not takings, analysis. Here, too, the majority address the wrong question and give the wrong answer. The takings clause has different and more stringent criteria than those applied under the majority's attempt to morph the deferential due process rational basis test into a takings clause test.

Moreover, whether at the time the Santa Monica rent control ordinance was enacted in April 1979 it was reasonable for the enacting body to believe that the ordinance would substantially advance the legislative purpose is not the question posed by this 1995 complaint. The question is whether at the time the complaint was filed in 1995, after 16 years of implementation, the ordinance had, in fact, substantially advanced its stated purpose.

(4) That the "substantially advance" test enunciated by the United States Supreme Court need not be applied to the stated legislative purpose underlying the ordinance if the ordinance may advance some other, unstated, purpose. Again, the majority err in suggesting that the court may sanction the uncompensated taking brought about by the imposition of rent control if the Santa Monica ordinance substantially advances *any* government purpose the court imagines may have justified the regulation if the legislative body had thought of that purpose.

Once the faulty assumptions underlying the majority's reasoning are eliminated and the issues actually raised in this case identified, it is apparent that the holding of the majority lacks a foundation in takings clause jurisprudence. The complaint does state a cause of action for inverse condemnation on plaintiff's theory that the ordinance has not substantially advanced and does not presently substantially advance the purpose offered in justification for abridgment of the rights of the owners of rental properties.

The complaint also states facts sufficient to demonstrate plaintiff's entitlement to compensation on a second theory—the ordinance goes "too far" both on its face and as applied to plaintiff's property. In order to provide a stock of rental housing affordable to persons with low incomes, young families, minorities, and the elderly, as well as other Santa Monica renters, plaintiff and all owners of Santa Monica rental property are compelled to bear a burden—subsidizing rentals—that in fairness and justice should be borne by the general public. That being so, just compensation must be paid to the owners of rental properties to which the ordinance is applied.

The Court of Appeal recognized that the tests enunciated in *Agins* v. *Tiburon* (1980) 447 U.S. 255, 260 [100 S.Ct. 2138, 2141, 65 L.Ed.2d 106] (*Agins*) and *Penn Central Transp. Co.* v. *New York City* (1978) 438 U.S. 104, 125-127 [98 S.Ct. 2646, 2660, 57 L.Ed.2d 631] (*Penn Central*) are still the measure by which a court determines if a property restriction goes too far and thus constitutes a compensable taking. The court then held that the complaint in this action states facts which, if proven, would show that the Santa Monica ordinance does go too far and thus constitutes a compensable taking. Under article VI, section 12, subdivision (b), of the California Constitution this court reviews decisions of the Court of Appeal, but nowhere in the majority opinion do we find a review of this holding or the analysis which supports it.[3]

No one can reasonably dispute that ensuring the availability of affordable housing for persons unable to pay market rate rents for clean, safe, and suitable housing is not only a proper, but also a laudable governmental purpose. However, the means by which a governmental entity achieves that purpose is circumscribed by not only the due process clause of the Fifth and Fourteenth Amendments to the United States Constitution, but also the takings clause of the Fifth Amendment which mandates that just compensation be paid when the government takes a private property right. My reasons for concluding that the complaint states a cause of action and that the judgment of the Court of Appeal should be affirmed follow in greater detail below.

---

[3]The complaint states a cause of action on a third ground—the Santa Monica rent control ordinance is not a valid exercise of the police power. There is no legitimate governmental interest in granting rent subsidies, through rent control, to tenants able to afford market rate rentals.

Although this is not a theory of relief identified by plaintiff in its complaint, the law is well settled that a complaint must be upheld against a demurrer if it states a cause of action on *any* theory. (*American Airlines, Inc.* v. *County of San Mateo* (1996) 12 Cal.4th 1110, 1118 [51 Cal.Rptr.2d 251, 912 P.2d 1198]; *Alliance Mortgage Co.* v. *Rothwell* (1995) 10 Cal.4th 1226, 1232 [44 Cal.Rptr.2d 352, 900 P.2d 601].) This is true whether or not the plaintiff has correctly identified the legal theory on which relief is available. (5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 905, p. 366.)

Nonetheless, since plaintiff has limited its challenge to one under the takings clause, I shall not pursue this theory further than to comment that the demographics of Santa Monica suggest that the benefits of rent control flow directly to persons who are able to afford market rate rents. Presently the median family income in Santa Monica is $51,085, and the per capita income of its residents is $29,134. More than 19 percent of households have income of $75,000 or more and over 15 percent of households have income between $50,000 to $74,999. Forty-three percent of residents over 25 years of age have bachelor's degrees or higher. In 1989 only 5.7 percent of families and 9.1 percent of persons over 65 years of age had incomes below the poverty level. Only 4.8 percent of households received public assistance. (U.S. Bureau of the Census, County and City Data Book: 1994, pp. 690-691.)

# I

## *The Inverse Condemnation Complaint*

This mandamus action arises out of a ruling by the Los Angeles County Superior Court sustaining the demurrer of the Santa Monica Rent Control Board to a complaint in inverse condemnation seeking to recover "just compensation" from the board for a "taking" of plaintiff's property through application of the city's rent control ordinance.

In ruling on the sufficiency of a complaint to withstand a demurrer, i.e., to state a cause of action, the court assumes the truth of all well-pleaded allegations. (*Lazar* v. *Superior Court* (1996) 12 Cal.4th 631, 635 [49 Cal.Rptr.2d 377, 909 P.2d 981].) The ability of the plaintiff to prove the allegations is irrelevant at this stage of the proceedings. We must, therefore, accept as true plaintiff's allegations. Briefly restated, the complaint alleges the following:

Santa Monica Beach, Ltd., owns a 12-unit apartment building on Sixth Street in Santa Monica. Rental of those units is subject to the provisions of a rent control ordinance that has been in effect since 1979 when it was adopted as part of article XVIII, in an amendment to the Santa Monica City Charter. Pursuant to the rent control ordinance a rent board establishes maximum allowable rents, provides for annual general adjustments, and may permit individual adjustments of allowable rents. Leave of the board, which may only be granted if a property subject to the ordinance does not produce a fair rate of return, is necessary before a controlled property may be removed from the rental market by demolition, conversion, or any other means. Eviction of a tenant is permissible only if the tenant fails to pay rent, violates a covenant of tenancy other than one requiring surrender of the property, causes a nuisance or substantial damage, uses or permits use of the unit for unlawful purposes, has refused at the termination of a tenancy to execute a written extension, denies reasonable access to the landlord, at the end of a tenancy the person in possession is a subtenant not approved by the landlord, or the unit is to be occupied by a close relative of the landlord.

Article XVIII, section 1800, constitutes the "Statement of Purpose" of the rent control ordinance, stating in pertinent part, and as amended in 1984:

"A growing shortage of housing units resulting in a low vacancy rate and rapidly rising rents exploiting this shortage constitute a serious housing problem affecting the lives of a substantial portion of those Santa Monica residents who reside in residential housing. In addition, speculation in the

purchase and sale of existing residential housing units results in further rent increases. These conditions endanger the public health and welfare of Santa Monica tenants, especially the poor, minorities, students, young families, and senior citizens. The purpose of this Article, therefore, is to alleviate the hardship caused by this serious housing shortage by establishing a Rent Control Board empowered to regulate rentals in the City of Santa Monica so that rents will not be increased unreasonably and so that landlords will receive no more than a fair return.

" . . . . . . . . . . . . . . . . . . . . . . . . .

"Through this Article, the city exercises its police power in order to address the serious housing problem recognized in the original enactment of this Rent Control Law in 1979 and still existing in 1984. The 1984 Amendment to the Rent Control Law is . . . intended to enable the Board to provide relief to persons facing particular hardship and to protect and increase the supply of affordable housing in the city. Termination or erosion of the protections of this Article would have serious disruptive consequences for persons in need of protection and the supply of affordable housing in the city."

The rent board denied plaintiff's March 27, 1992, application for a rent adjustment and on a subsequent March 30, 1993, application granted an increase of $3 per unit and temporary rent increases averaging $58 per month.[4]

A fair reading of those allegations of the complaint and the rent control ordinance is that, but for the limits imposed under the rent control ordinance, plaintiff could receive higher, market rate, rents for its apartments.

The complaint next contends that the rent control ordinance violates plaintiff's rights under the takings clause of the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 19 of the California Constitution[5] because it fails to substantially advance a legitimate governmental interest. It fails because application of the ordinance has

---

[4]Plaintiff has challenged that action in a petition for writ of (administrative) mandamus joined with the instant complaint for inverse condemnation that is still pending in the superior court.

[5]California Constitution, article I, section 19, provides in pertinent part: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner."

The Fifth Amendment is applicable to the states through incorporation into the Fourteenth Amendment. (*Webb's Fabulous Pharmacies, Inc.* v. *Beckwith* (1980) 449 U.S. 155, 160 [101 S.Ct. 446, 450, 66 L.Ed.2d 358]; *Chicago, Burlington &c. R'd Co.* v. *Chicago* (1897) 166 U.S. 226, 239 [17 S.Ct. 581, 585-586, 41 L.Ed. 979].) While article I, section 19, of the California

reduced the availability of private rental housing in Santa Monica and has made it more difficult for low-income renters, young families, and the elderly to find affordable rental housing.

From 1980 to the end of the decade, under rent control, the number of low-income-renter households decreased by 775, or 12 percent, while the number increased in every comparable city in Southern California that did not have rent control. The number of very-low-income households decreased by 285 during the decade. At the same time very-high-income households increased by 37 percent, although their number dropped in Los Angeles County as a whole.

During the decade of the 1980's, the number of family households with children in Santa Monica fell by 1,299, a 6 percent decline, while there was no loss in comparable cities in Southern California without rent control. Female-headed households with children under 18 fell by 593, a 27 percent decrease, while the number increased in Los Angeles County as a whole.

The population of elderly in Santa Monica declined by 1.7 percent during the decade, while during the same period it increased in Los Angeles County by more than 15 percent, and it increased in comparable cities without rent control in Southern California.

Plaintiff asserted, on this basis, that denial of its application for a rent adjustment did not substantially advance a legitimate governmental interest and there was not a close nexus between the denial of the application for a fair rate of return on its capital investment and any public harm that might result from unregulated operation of the property. Unregulated use of the property would not have resulted in the problems Santa Monica sought to address through adoption of the rent control ordinance.

Plaintiff also alleged that even if the ordinance does substantially advance a proper governmental purpose, denial of its application seeking a fair rate of return had the effect of making application of the ordinance to its property "confiscatory." Moreover, the ordinance has denied petitioner essential attributes of ownership of the property, including the right to exclude others and the right to determine the terms on which leasehold interests in plaintiff's property will be alienated.

Arguing that for all of the above reasons the rent control board's application of the ordinance to its property comprises a regulatory taking for public

Constitution protects a broader range of property rights than does the Fifth Amendment (*Hensler* v. *City of Glendale* (1994) 8 Cal.4th 1, 9, fn. 4 [32 Cal.Rptr.2d 244, 876 P.2d 1043]; *Varjabedian* v. *City of Madera* (1977) 20 Cal.3d 285, 298 [142 Cal.Rptr. 429, 572 P.2d 43]), it does not do so with respect to rent control legislation. For ease of reference, therefore, I refer only to the takings clause or Fifth Amendment.

use without just compensation, plaintiff sought a trial at which it could offer evidence in support of its claims.

Plaintiff's inverse condemnation claim thus rested on three different theories under any of which it was entitled to just compensation for the regulatory taking of its right to unregulated use of its rental units:

1. After a decade of implementation the Santa Monica rent control ordinance not only failed to substantially advance the stated governmental purpose, it made the problem it sought to address worse. Under this theory, application of the ordinance to any property for which higher rent could be obtained absent regulation would constitute a taking for a public purpose for which just compensation must be paid.

2. Application of the ordinance to plaintiff's property did not substantially advance the stated governmental purpose because there was no basis for concluding that unregulated rental of plaintiff's apartments would contribute to the shortage of affordable rental units in Santa Monica. Therefore, plaintiff's property has been taken for a public purpose and plaintiff is entitled to just compensation for the taking.

3. Because the rent adjustments allowed plaintiff by the board did not ensure a fair rate of return on investment, application of the ordinance to plaintiff's property was confiscatory. This claim is not presently before the court. It should be resolved in the pending administrative mandamus action.

The superior court did not consider whether the ordinance on its face created a constitutionally impermissible taking without just compensation, but ruled that the complaint failed to state a cause of action for inverse condemnation on plaintiff's theories. The superior court rejected plaintiff's argument that *Nollan* v. *California Coastal Comm'n* (1987) 483 U.S. 825 [107 S.Ct. 3141, 97 L.Ed.2d 677] (*Nollan*), in which the court applied the "substantially advance" test in finding a regulatory taking, mandated a heightened standard of review, and ruled that the appropriate standard of review was the "rational basis" standard. Thus, it impliedly concluded that plaintiff could not prevail because the city had a rational basis for finding that the public health and welfare, and particularly that of the identified groups, was endangered by unregulated rents and that the ordinance would prevent or minimize the threatened harm.

The Court of Appeal, reviewing the superior court order on petition for writ of mandate, disagreed with that reasoning and ordered that a peremptory writ of mandate issue commanding the superior court to set aside its order

and overrule the board's demurrer. The Court of Appeal reasoned that the question raised by the complaint was whether continued application of the ordinance to plaintiff's property constituted a compensable taking for a public purpose because absent just compensation, in the words of the United States Supreme Court, "it went too far" to be a constitutionally permissible interference with plaintiff's rights as an owner of property. That question could not be resolved on demurrer. The Court of Appeal also recognized that *Nollan, supra,* 483 U.S. at page 834, footnote 3 [107 S.Ct. at page 3148], had expressly rejected application of the rational basis test in takings cases, stating: "To the contrary, our verbal formulations in the takings field have generally been quite different. We have required that the regulation 'substantially advance' the 'legitimate state interest' sought to be achieved, *Agins* v. *Tiburon,* 447 U.S. 255, 260 (1980), not that 'the State "*could rationally have decided*" that the measure adopted might achieve the State's objective.'" (Original italics.)

Although whether *on its face* this ordinance exceeds the permissible scope of the police power could be resolved by the court without taking evidence, the question posed by plaintiff in the complaint is whether over time the ordinance has substantially advanced the legislative purpose. This question cannot be decided on demurrer. If plaintiff can prove that the rent control ordinance has not substantially advanced its purpose, or that application of the ordinance to its property does not substantially advance the purpose, the "compensable taking" element of a cause of action for inverse condemnation would be established. This is true notwithstanding that the city may be able to show that there was a rational basis for the law when it was adopted.

II

*Price Control and Zoning*

In their misguided attempt to identify a level of judicial scrutiny that will satisfy the takings clause, the majority suggest that price controls and zoning legislation are sufficiently analogous to rent control to warrant placement of these types of government action in a continuum of levels of judicial scrutiny. Again, they err. The price control and zoning standards to which they look are those developed in due process challenges to the validity of legislation, not takings clause claims for just compensation because property has been subjected to those laws. The level of judicial scrutiny accorded legislation subjected to due process challenges is irrelevant in a takings clause claim.

That regulation of prices other than rents is a proper exercise of the police power is well established. This was recognized by the Supreme Court more

than a century ago in *Munn* v. *Illinois* (1876) 94 U.S. 113, 124 [24 L.Ed. 77]. The validity of an Illinois statute fixing the maximum charge for storage of grain in private warehouses was in issue. It was argued that the restrictions took property without due process of law. There, speaking for the court, Chief Justice Waite explained the due process source of authority for the statute:

"When one becomes a member of society, he necessarily parts with some rights or privileges which, as an individual not affected by his relations to others, he might retain. 'A body politic,' as aptly defined in the preamble of the Constitution of Massachusetts, 'is a social compact by which the whole people covenants with each citizen, and each citizen with the whole people, that all shall be governed by certain laws for the common good.' This does not confer power on the whole people to control rights which are purely and exclusively private, [citation]; but it does authorize the establishment of laws requiring each citizen to so conduct himself, and so use his own property, as not unnecessarily to injure another. This is the very essence of government, and has found expression in the maxim *sic utere tuo ut alienum non laedas*. From this source comes the police powers, which, as was said by Mr. Chief Justice Taney in the *License Cases*, 5 How. 583, 'are nothing more or less than the powers of government inherent in every sovereignty, . . . that is to say, . . . the power to govern men and things.' Under these powers the government regulates the conduct of its citizens one towards another, and the manner in which each shall use his own property, when such regulation becomes necessary for the public good. In their exercise it has been customary in England from time immemorial, and in this country from its first colonization, to regulate ferries, common carriers, hackmen, bakers, millers, wharfingers, innkeepers, &c., and in so doing to fix a maximum of charge to be made for services rendered, accommodations furnished, and articles sold. To this day, statutes are to be found in many of the States upon some or all of these subjects; and we think it has never yet been successfully contended that such legislation came within any of the constitutional prohibitions against interference with private property. With the Fifth Amendment in force, Congress, in 1820 conferred power upon the city of Washington 'to regulate . . . the rates of wharfage at private wharves, . . . the sweeping of chimneys, and to fix the rates of fees therefor, . . . and the weight and quality of bread,' [citation]; and, in 1848, 'to make all necessary regulations respecting hackney carriages and the rates of fare of the same, and the rates of hauling by cartmen, wagoners, carmen, and draymen, and the rates of commission of auctioneers,' [citation].

"From this it is apparent that, down to the time of the adoption of the Fourteenth Amendment, it was not supposed that statutes regulating the use,

or even the price of the use, of private property necessarily deprived an owner of his property without due process of law. Under some circumstances they may, but not under all. The amendment does not change the law in this particular: it simply prevents the States from doing that which will operate as such a deprivation." (94 U.S. at pp. 124-125.)

The court recognized in *Munn* v. *Illinois, supra,* 94 U.S. 113, that it is necessary to understand the principles underlying exercise of the police power in order to determine when the power is exercised in a constitutionally permissible manner, and explained that when property is affected with a public interest the property is no longer wholly private. "When, therefore, one devotes his property to a use in which the public has an interest, he in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use; but, so long as he maintains the use, he must submit to the control." (*Id.* at p. 126.)

The court addressed exercise of the police power to regulate prices again in *Nebbia* v. *New York* (1934) 291 U.S. 502, 525 [54 S.Ct. 505, 525, 78 L.Ed. 940, 89 A.L.R. 1469]: "The Fifth Amendment, in the field of federal activity, and the Fourteenth, as respects state action, do not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained. . . . [¶] . . . [¶] The court has repeatedly sustained curtailment of enjoyment of private property, in the public interest. The owner's rights may be subordinated to the needs of other private owners whose pursuits are vital to the paramount interest of the community." (Fns. omitted.)

After an exhaustive survey of the areas of private rights theretofore held to be subject to regulation under the police power, the court turned to the New York statute before it, a law which fixed minimum prices for milk. The court found a proper governmental purpose—preventing demoralizing competitive conditions and unfair trade practices which reduced the income of producers below the cost of production. It then rejected an argument that price control was per se unreasonable and unconstitutional except as to business affected with a public interest, i.e., one in which the property is devoted to a purpose which the public as such might undertake, or one dependent on a public grant or franchise, or is bound to serve all comers—public utilities and/or

monopolies. "The due process clause makes no mention of sales or of prices any more than it speaks of business or contracts or buildings or other incidents of property. The thought seems nevertheless to have persisted that there is something peculiarly sacrosanct about the price one may charge for what he makes or sells, and that, however able to regulate other elements of manufacture or trade, with incidental effect upon price, the state is incapable of directly controlling the price itself. This view was negatived many years ago. *Munn* v. *Illinois*, 94 U.S. 113." (291 U.S. at p. 532 [54 S.Ct. at p. 514].)

Retreating from the language in *Munn* which suggested that regulation of prices was justified only when the property had been devoted to a public use, the court held: "The statement that one has dedicated his property to a public use is . . . merely another way of saying that if one embarks in a business which public interest demands shall be regulated, he must know regulation will ensue." (*Nebbia* v. *New York*, *supra*, 291 U.S. at p. 534 [54 S.Ct. at p. 514].) "[T]here can be no doubt that upon proper occasion and by appropriate measures the state may regulate a business in any of its aspects, including the prices to be charged for the products or commodities it sells. [¶] So far as the requirement of due process is concerned, and *in the absence of other constitutional restriction*, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court *functus officio*. 'Whether the free operation of the normal laws of competition is a wise and wholesome rule for trade and commerce is an economic question which this court need not consider or determine.' " (*Nebbia* v. *New York*, *supra*, 291 U.S. at p. 537 [54 S.Ct. at p. 516], italics added.) "The Constitution does not secure to anyone liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people. Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty." (*Id.* at pp. 538-539 [54 S.Ct. at pp. 516-517].)

This continues to be the rule insofar as price controls in general are concerned. As the court acknowledged in *Nebbia* v. *New York*, *supra*, 291 U.S. 502, 537 [54 S.Ct. 505, 516], however, it is so only "in the absence of other constitutional restriction." The takings clause is another constitutional restriction. A law restricting property rights may be valid as a proper

exercise of the police power, but nonetheless violate the takings clause unless just compensation is paid by the government for the diminution of those rights.

Zoning laws, too, have long been upheld under the deferential, rational basis, level of judicial scrutiny applied in due process based challenges to economic and social legislation. Before a general zoning ordinance will be declared unconstitutional the court must conclude that the law is " 'clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.' " (*Eastlake* v. *Forest City Enterprises, Inc.* (1976) 426 U.S. 668, 676 [96 S.Ct. 2358, 2363, 49 L.Ed.2d 132]; *Euclid* v. *Ambler Co.* (1926) 272 U.S. 365, 394 [47 S.Ct. 114, 120, 71 L.Ed. 303]; see also *Consolidated Rock Products Co.* v. *City of Los Angeles* (1962) 57 Cal.2d 515, 522-523 [20 Cal.Rptr. 638, 370 P.2d 342].)

There is no comparable level of judicial scrutiny when it is claimed that a zoning law takes property for which compensation must be paid, however. This is so because determining whether a zoning law brings about a compensable taking can be determined only after considering a variety of evidentiary factors. (*Lucas* v. *South Carolina Coastal Council* (1992) 505 U.S. 1003, 1030-1031 [112 S.Ct. 2886, 2901, 120 L.Ed.2d 798]; *Hansen Brothers Enterprises, Inc.* v. *Board of Supervisors* (1996) 12 Cal.4th 533, 531 [48 Cal.Rptr.2d 778, 907 P.2d 1324].) As this court recognized in *Landgate, Inc.* v. *California Coastal Com.* (1998) 17 Cal.4th 1006, 1016-1017 [73 Cal.Rptr.2d 841, 953 P.2d 1188], unless a takings claim is based on denial of all beneficial use or physical invasion of the property, whether a compensable taking exists requires a "case-specific inquiry."

### III

### *Rent Control and the Takings Clause*

The majority proceed on an assumption that it has also been settled that rent control does not bring about a compensable taking. Again they err. Neither the United States Supreme Court nor this court has held in a takings clause challenge that a rent control law like the Santa Monica ordinance is constitutionally permissible absent payment of just compensation. The United States Supreme Court has upheld rent control as an exercise of Congress's war powers or to confront an emergency arising during or out of a world war. Neither the Supreme Court nor this court has ever applied contemporary takings clause jurisprudence to a peacetime rent control law of indefinite duration enacted simply to address a problem created by rising rents.

The analytical focus in assessing whether rent control constitutes a taking for which the takings clause mandates just compensation must be directed to the means by which rent control accomplishes its purpose. Rent control differs from and cannot be equated to other forms of price control because it encroaches on property rights in ways that price control does not. The Santa Monica rent control ordinance takes from the property owner the right to charge market rent for the owner's property and by so doing compels the owner to subsidize the tenant. Price control creates no comparable direct transfer of a property interest to a third person. The ordinance in question depresses the value of the rent-controlled property. Unlike property used to manufacture price-controlled items, rental housing cannot easily be used for other purposes and the Santa Monica ordinance severely limits the ability of the owner to go out of the rental housing business. Finally, the ordinance tranfers to the tenant the right to occupy the property for an indefinite period. Again, none of this is true of other forms of price control. Thus we cannot assume that decisions upholding other forms of price control are authority for rejecting a takings clause challenge to a rent control ordinance.

The Supreme Court first addressed takings clause challenges to the validity of rent control laws enacted as federal wartime emergency legislation. (See *Block* v. *Hirsh* (1921) 256 U.S. 135 [41 S.Ct. 458, 65 L.Ed. 865, 16 A.L.R. 165] (*Block*); *Woods* v. *Miller Co.* (1948) 333 U.S. 138 [68 S.Ct. 421, 92 L.Ed. 596] (*Woods*); *Bowles* v. *Willingham* (1944) 321 U.S. 503 [64 S.Ct. 641, 88 L.Ed. 892] (*Bowles*).) None of those decisions upheld application of rent control without payment of just compensation in a challenge such as that made here.

*Block,* the first of the decisions which are sometimes relied on in support of the proposition that rent control is constitutionally permissible, addressed the claim of a Washington, D.C., property owner that the Act of October 22, 1919 (41 Stat. 297, 301) was a constitutionally invalid attempt to authorize the taking of property not for public use and without due process of law insofar as it permitted a lessee to refuse to surrender the premises on expiration of the lease. The law, which was to expire in two years unless sooner repealed, gave the owner the right to retake the property for his own occupancy on thirty days' notice, but the owner had not given that notice before seeking to recover possession. The statute included a declaration that the restrictions were made necessary "by emergencies growing out of the war, resulting in rental conditions in the District dangerous to the public health and burdensome to public officers, employees and accessories, and thereby embarrassing the Federal Government in the transaction of the public business." (256 U.S. at p. 154 [41 S.Ct. at p. 459].) The court noted that "Congress stated a publicly notorious and almost world-wide fact. That

the emergency declared by the statute did exist must be assumed . . . ." (*Id.* at pp. 154-155 [41 S.Ct. at p. 459].)

The Supreme Court concluded that the circumstances were such as to clothe the rental of buildings in the District of Columbia with a public interest great enough to justify regulation, noting, however, that what may create that interest at one time may at others be purely a matter of private concern. At the time of this legislation, a "public exigency" justified "restricting property rights . . . to a certain extent without compensation." (*Block, supra*, 256 U.S. at p. 156 [41 S.Ct. at p. 459].)

The court then considered whether the statute went "too far," recognizing that "just as there comes a point at which the police power ceases and leaves only that of eminent domain, it may be conceded that regulations of the present sort pressed to a certain height might amount to a taking without due process of law. *Martin* v. *District of Columbia* [(1907)] 205 U.S. 135 [27 S.Ct. 440, 51 L.Ed. 743]." (*Block, supra*, 256 U.S. at p. 156 [41 S.Ct. at p. 460].) The court did not have to draw that line, however, as "[t]he regulation is put and justified only as a temporary measure. [Citations.] A limit in time, to tide over a passing trouble, well may justify a law that could not be upheld as a permanent change." (*Id.* at p. 157 [41 S.Ct. at p. 460].)

The high court next considered a challenge to rent control in the District of Columbia in *Chastleton Corp.* v. *Sinclair* (1924) 264 U.S. 543 [44 S.Ct. 405, 68 L.Ed. 841]. The plaintiff sought to restrain enforcement of a rent commission order reducing rents under the authority of a 1921 law declaring that the emergency still existed and purporting to continue the law upheld in *Block.* The court, impliedly accepting the plaintiff's theory that if the emergency had ended the restriction would violate the takings clause, remanded the case to the District of Columbia courts for an evidentiary hearing to determine whether conditions had changed, stating that "If about all that remains of war conditions is the *increased cost of living, that is not in itself a justification* of the act." (264 U.S. at p. 548 [44 S.Ct. at p. 406], italics added.)

Subsequently, in *New State Ice Co.* v. *Liebmann* (1932) 285 U.S. 262, 277 [52 S.Ct. 371, 374, 76 L.Ed. 747], the court again emphasized that rents may not be subjected to legislative regulation "except as to temporary measures to tide over grave emergencies." (See also *Tyson & Brother* v. *Banton* (1927) 273 U.S. 418, 437-438 [47 S.Ct. 426, 431, 71 L.Ed. 718, 58 A.L.R. 1236] ["[T]he business of renting houses and apartments is not so affected with a public interest as to justify legislative fixing of prices unless some great emergency exists. *Block* v. *Hirsh, supra*, 256 U.S. at p. 157 [41 S.Ct. at p.

460]; *Chastleton Corp.* v. *Sinclair*, 264 U.S. 543, 548 [44 S.Ct. at p. 406]. And even with the emergency, the statutes 'went to the verge of the law.' "].)

During the Second World War, in *Bowles*, the Emergency Price Control Act of 1942 (56 Stat. 23, 50 U.S.C. Appen. (Former supp. II) § 901) was challenged as a constitutionally impermissible delegation of legislative authority and as a deprivation of property without due process. Congress had expressly invoked its war powers as authority for the legislation and that power was not challenged. The court concluded that the standards for fixing rents were sufficiently definite and accorded property owners due process, relying in part on *Block*. The court also stated: "Moreover, there would be no constitutional objection if Congress as a war emergency measure had itself fixed the maximum rents in these areas. We are not dealing here with a situation which involves a 'taking' of property. *Wilson* v. *Brown, supra.*[6] By § 4 (d) of the Act it is provided that 'nothing in this Act shall be construed to require any person to sell any commodity or to offer any accommodations for rent.' There is no requirement that the apartments in question be used for purposes which bring them under the Act. Of course, price control, the same as other forms of regulation, may reduce the value of the property regulated. But as we have pointed out in the *Hope Natural Gas Co.* case ([(1944)] 320 U.S. [591,] 601 [64 S.Ct. 281, 88 L.Ed. 333]), that does not mean that the regulation is unconstitutional. Mr. Justice Holmes, speaking for the Court,

---

[6]*Wilson* v. *Brown* (Emer.Ct.App. 1943) 137 F.2d 348 rejected a challenge to rent ceilings imposed in Chicago pursuant to the Emergency Price Control Act. The property owner complained that the rent adjustments permitted did not produce a fair return on investment. The court questioned any analogy between the due process requirement of fair return on value in rate regulation for public utilities to the requirement of just compensation for taking of property by eminent domain, but relied on the war powers doctrine to sustain application of the law to rental property. "[W]e are satisfied that principles derived from the law of eminent domain are not the proper constitutional criterion for determining the validity of a nation-wide program of price and rent control enacted by Congress under its war powers. In the case of public utilities there is an extensive and permanent regulation of the use of the properties in the public interest, of which the regulation of rates is only a part. The situation more nearly approaches a 'taking' of the properties, or the use thereof, than in the case of war-time rent regulation. . . . [T]he Emergency Price Control Act is concerned with the regulation of prices and rents which are normally determined by the operation of economic forces in a free competitive market; it is not designed 'as a *permanent* substitute for the normal operation of competitive forces, but as a bridge over a period of emergency when the normal influences of the market place are temporarily distorted by war conditions.' The useful life of housing accommodations extends far beyond the contemplated period of rent control. There is, in fact, no appropriation of the housing accommodations at all, and so far as there is a narrow restriction on their use, it is for a very limited period. 'A limit in time, to tide over a passing trouble, well may justify a law that could not be upheld as a permanent change.' Block v. Hirsh, 1921, 256 U.S. 135, 157, 41 S.Ct. 458, 460, 65 L.Ed. 865, 16 A.L.R. 165. . . . The landlord is . . . free to occupy the property himself, or devote it to some commercial enterprise, or utilize it in any other way. This serves to emphasize that there has been no 'taking' of his property in the constitutional sense." (*Id.* at pp. 351-352.)

stated in *Block* v. *Hirsh*, *supra*, p. 155: 'The fact that tangible property is also visible tends to give a rigidity to our conception of our rights in it that we do not attach to others less concretely clothed. But the notion that the former are exempt from the legislative modification required from time to time in civilized life is contradicted not only by the doctrine of eminent domain, under which what is taken is paid for, but by that of the police power in its proper sense, under which property rights may be cut down, and to that extent taken, without pay.' A member of the class which is regulated may suffer economic losses not shared by others. His property may lose utility and depreciate in value as a consequence of regulation. But that has never been a barrier to the exercise of the police power. [Citations.] And the restraints imposed on the national government in this regard by the Fifth Amendment are no greater than those imposed on the States by the Fourteenth." (*Bowles*, *supra*, 321 U.S. at pp. 517-518 [64 S.Ct. at pp. 648-649].)

This broad language in *Bowles* was immediately qualified, however, by the court's further observation: *"We need not determine what constitutional limits there are to price-fixing legislation. Congress was dealing here with conditions created by activities resulting from a great war effort.* [Citation.] A nation which can demand the lives of its men and women in the waging of that war is under no constitutional necessity of providing a system of price control on the domestic front which will assure each landlord a 'fair return' on his property." (*Bowles*, *supra*, 321 U.S. at p. 519 [64 S.Ct. at p. 649], italics added.)

In *Woods* the district court had enjoined enforcement of title II of the Housing and Rent Act of 1947 (61 Stat. 193, 196) on the ground that Congress's power to regulate rent ended with a presidential proclamation terminating hostilities. The high court reversed, holding that the 1947 legislation was a valid exercise of the war power of Congress and rejected a claim that exemption of some classes of housing violated the Fifth Amendment.

Although the Supreme Court subsequently stated in *Pennell* v. *San Jose* (1988) 485 U.S. 1, 12, footnote 6 [108 S.Ct. 849, 857-858, 99 L.Ed.2d 1], that it saw "no need to reconsider the constitutionality of rent control *per se*," and such reexamination may not have been necessary in that case, in fact the court has not upheld rent control against a takings clause challenge other than in wartime emergency circumstances. Those decisions do not uphold peacetime, nonemergency, rent control legislation of indefinite duration against a takings clause challenge either as to the denial of the property owner's right to receive whatever rent the free, competitive market will produce, or as to the restriction on the rights of the owner to use the property

for any purpose, withdraw it from the rental market, or terminate tenancies. *Bowles* made it clear that whether a permanent rent control scheme constitutes a compensable taking under the Fifth Amendment is still an open question.[7]

More recently the Supreme Court has abandoned the concept of property clothed with a public interest the use of which could be restricted through exercise of the police power without compensation, turning instead in Fifth Amendment cases to an ad hoc determination of whether, because a particular regulation goes too far, a compensable taking has occurred. *Penn Central, supra,* 438 U.S. 104, and *Hodel* v. *Irving* (1987) 481 U.S. 704 [107 S.Ct. 2076, 95 L.Ed.2d 668] (*Hodel*) exemplify this approach. The "taking" for which just compensation must be paid is not a taking of the entire property but of any of the interests in property, the "sticks" which make up the "bundle of rights" which an owner may claim. (See, e.g., *Hodel, supra,* 481 U.S. at p. 716 [107 S.Ct. at p. 2083] [right to devise property]; *Kaiser Aetna* v. *United States, supra,* 444 U.S. at p. 176 [100 S.Ct. at p. 391] [right to exclude others].)

The concept of compensable regulatory taking, hinted at in the early rent control cases, had been expressly recognized earlier in *Penna. Coal* v. *Mahon* (1922) 260 U.S. 393 [43 S.Ct. 158, 67 L.Ed. 322, 28 A.L.R. 1321] (*Pennsylvania Coal*), which confirmed that *Block* and its wartime rent control progeny were not a Supreme Court imprimatur for rent control legislation. There, owners of surface rights to property under which the coal company had reserved the right to remove all coal, with the surface owners waiving all claims for resulting damages, sought to prevent mining that would cause subsidence. They claimed that the company's rights had been abrogated by a state statute which forbade mining in a manner that would cause subsidence of a home. The company argued that if applied retroactively the statute would be unconstitutional. The state court upheld the statute as a legitimate exercise of the police power. The Supreme Court, in an opinion by Justice Holmes, reversed, stating as a general rule "that while property may be regulated to a certain extent, *if regulation goes too far it will be recognized as a taking.* It may be doubted how far exceptional cases, like the blowing up of a house to stop a conflagration, go—and if they go beyond the general rule, whether they do not stand as much upon tradition as upon principle. [Citation.] In general it is not plain that a man's misfortunes or

---

[7]I am not alone in this conclusion. (See Radford, *Why Rent Control Is a Regulatory Taking* (1995) 6 Fordham Envtl. L.J. 755. (Radford); Stout, *Making Room at the Inn: Rent Control as a Regulatory Taking* (1990) 38 Wash. U. J. Urb. & Contemp. L. 305.)

The petitioners in *Yee* v. *Escondido* (1992) 503 U.S. 519, 526 [112 S.Ct. 1522, 1527-1528, 118 L.Ed.2d 153] did not make a claim that rent control statutes violate the takings clause.

necessities will justify shifting the damages to his neighbor's shoulders. [Citations.] *We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change.* As we already have said this is a question of degree—and therefore cannot be disposed of by general propositions. But we regard this as going beyond any of the cases decided by this Court. The late decisions upon laws dealing with the congestion of Washington and New York, caused by the war, dealt with laws intended to meet a temporary emergency and providing for compensation determined to be reasonable by an impartial board. They were to the verge of the law but fell far short . . . ." (260 U.S. at pp. 415-416 [43 S.Ct. at p. 160], italics added.)

This limitation on uncompensated taking was echoed in *Armstrong* v. *United States* (1960) 364 U.S. 40, 49 [80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554], where the court adopted the ultimate test of a compensable taking, one which is still applicable: "The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."

The court's first attempt to establish guidelines for determining whether a land use regulation goes too far and thus becomes a compensable taking came in *Penn Central, supra,* 438 U.S. 104. The court acknowledged that the constitutional concern recognized by Justice Holmes in *Pennsylvania Coal, supra,* 260 U.S. 393, and applied in *Armstrong* v. *United States, supra,* 364 U.S. 40, to government conduct which destroyed the value of privately held liens—whether in light of the nature of the restriction and its purpose, the property owner has been forced to bear public burdens which, in fairness and justice should be borne by the public as a whole—determines whether a land use regulation goes so far as to constitute a compensable taking.

In *Penn Central* the court then made it clear that the ultimate purpose of balancing the factors it has identified as relevant in deciding if a land use regulation goes too far is to ensure that land use regulations are not used to compel individuals to assume burdens that should be borne by the public as a whole. "While this Court has recognized that the 'Fifth Amendment's guarantee . . . [is] designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole,' *Armstrong* v. *United States,* 364 U.S. 40, 49 (1960), this Court, quite simply, has been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather

than remain disproportionately concentrated on a few persons." (438 U.S. at pp. 123-124 [98 S.Ct. at p. 2659].) Thus, regardless of the manner in which the factors identified by the court as relevant to determining if a land use restriction is valid are applied, the question to be answered is always the same—is this landowner being forced to assume what should be a public burden. The court has repeatedly recognized this as the litmus test of a compensable taking. (See *Dolan* v. *City of Tigard* (1994) 512 U.S. 374, 384 [114 S.Ct. 2309, 2316, 129 L.Ed.2d 304] (*Dolan*); *Lucas* v. *South Carolina Coastal Council, supra,* 505 U.S. at p. 1018 [112 S.Ct. at pp. 2894-2895]; *Pennell* v. *City of San Jose, supra,* 485 U.S. at p. 9 [108 S.Ct. at p. 856]; *First Lutheran Church* v. *Los Angeles County* (1987) 482 U.S. 304, 318-319 [107 S.Ct. 2378, 2388, 96 L.Ed.2d 250]; *Hodel, supra,* 481 U.S. at p. 714 [107 S.Ct. at p. 2082]; *Kaiser Aetna* v. *United States, supra,* 444 U.S. at p. 176 [100 S.Ct. at p. 391].)

In *Penn Central,* the court identified two factors whose relevance had been recognized in earlier cases as important in determining whether application of a land use regulation constitutes a taking:

1. The economic impact of the regulation on the property owner, particularly the extent to which the regulation interferes with distinct investment-backed expectations.

2. The character of the governmental action—physical invasion is more readily found to be a taking than interference caused by a public program which adjusts the benefits and burdens of economic life to promote the common good. Restrictions designed to enhance the quality of life by preserving desirable aesthetic features and zoning laws were given as examples of laws which prohibit beneficial uses and may cause substantial individual harm, but nonetheless have been upheld as permissible because they promote the health, safety, morals, or general welfare of the public. (*Penn Central, supra,* 438 U.S. at pp. 125-129 [98 S.Ct. at pp. 2659-2661].)

Application of a landmarks preservation law to the Grand Central Terminal property in New York City was upheld because the law was substantially related to promotion of the general welfare, it permitted beneficial use of the property as it did not interfere with the existing use, it was not shown that all use of the air space above the terminal was prohibited, and the owner was granted transferable development rights which could be used to develop other properties.

The economic impact of the regulation, its interference with investment-backed expectations and the character of the governmental action are factors

which the high court continues to recognize as having particular significance. (*Hodel, supra*, 481 U.S. at p. 714 [107 S.Ct. at p. 2082]; *Kaiser Aetna v. United States, supra*, 444 U.S. at p. 175 [100 S.Ct. at p. 390].) In *Hodel, supra*, 481 U.S. at page 715 [107 S.Ct. at pages 2082-2083], the court also recognized another factor which is particularly significant in the rent control arena and was first applied in *Pennsylvania Coal, supra*, 260 U.S. at page 415 [43 S.Ct. at page 160]—the "reciprocity of advantage" between the government and the owner whose property rights are restricted.[8]

Finally, regardless of the relative weight of these factors, a land use restriction will constitute a taking for which just compensation must be paid if it does not " 'substantially advance legitimate state interests.' " (*Lucas* v. *South Carolina Coastal Council, supra*, 505 U.S. at p. 1016 [112 S.Ct. at p. 2894]; *Agins, supra*, 447 U.S. at p. 260 [100 S.Ct. at p. 2141].)

This court has upheld local rent control, but only against due process based challenges. (See *Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644 [209 Cal.Rptr. 682, 693 P.2d 261]; *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129 [130 Cal.Rptr. 465, 550 P.2d 1001].) While the court has concluded that such legislation is a proper exercise of the police power even in the absence of an emergency, the court has never applied takings clause jurisprudence to such laws.

The assumption of the majority that just compensation need not be paid for the application of rent control to private property thus finds no support in the authorities on which they rely.

## IV

*Does This Complaint State Facts to Show That the Santa Monica Ordinance Has Not Substantially Advanced Legislative Goals?*

The majority make no effort to address this crucial question, digressing instead into the effort to determine whether *Nollan, supra*, 483 U.S. 825, and *Dolan, supra*, 512 U.S. 374, somehow establish a level of judicial scrutiny applicable in takings clause cases in which it is claimed that a land use regulation fails to substantially advance a legitimate governmental purpose. The "substantially advance" test, the aspect of takings clause jurisprudence

---

[8]In *Lucas* v. *South Carolina Coastal Council, supra*, 505 U.S. 1003, the court noted only two categories of interference which inevitably go too far and for which just compensation is mandated by the Fifth Amendment—physical occupation of any part of the property (see *Loretto* v. *Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419 [102 S.Ct. 3164, 73 L.Ed.2d 868]) and a regulation which denies the owner all economically beneficial or productive use of land (see *Agins, supra*, 447 U.S. 255).

on which plaintiff relies, is not new. It was applied in *Agins, supra*, 447 U.S. at page 261 [100 S.Ct. at pages 2141-2142], and is derived from *Nectow* v. *Cambridge* (1928) 277 U.S. 183, 188 [48 S.Ct. 447, 448, 72 L.Ed. 842]. *Nollan* and *Dolan* did no more than demonstrate the effect of the test in an "as applied" challenge to an administrative adjudicative application of a land use regulation. In so doing, the United States Supreme Court made it clear beyond any question that the protection of property rights guaranteed by the takings clause is independent of and broader than the protections afforded by the due process clause. The court also made it clear that whenever a takings clause claim is before a court, the role of the court is to hear or consider evidence and make factual findings to support a ruling on a well-pleaded takings claim.

The complaint in this action alleges facts which, if proven, will establish that the uncompensated taking of plaintiff's property rights brought about by the Santa Monica rent control ordinance cannot be justified under the takings clause because, after a reasonable period of implementation, the ordinance has not substantially advanced the goals which justified the restrictions on plaintiff's rights. Instead of preserving affordable housing for tenants unable to pay market rents, the ordinance has created a haven for tenants regardless of their ability to pay while decreasing the number of rental units occupied by tenants intended to be benefited.

The Santa Monica rent control ordinance has now been in effect for 20 years, a long enough period to evaluate whether it does, in fact, substantially advance its purpose. The majority nonetheless hold that the complaint does not state a cause of action and deny plaintiff the right to attempt to prove that the Santa Monica rent control ordinance has not preserved the supply of affordable rental housing for low-income tenants, families with children, the elderly, or other tenants in need of "affordable" rental housing.

The majority do so on the basis of their erroneous conclusion that a deferential standard of review is permissible, and in the erroneous belief that the complaint fails to state facts sufficient to support the claim that the ordinance has not substantially advanced a legitimate goal.[9] The majority also express concern that declaring that a rent control law which has not achieved its purpose constitutes a taking for which compensation must be

---

[9]To the extent that this holding is based on a perceived inadequacy of the census data to support the claim, the majority again err. The plaintiff need only allege facts. (Code Civ. Proc., § 425.10, subd. (a).) All that is necessary is that the pleading as a whole apprise the defendant of the factual basis of the claim. (*Jackson* v. *Superior Court* (1994) 30 Cal.App.4th 936, 942 [36 Cal.Rptr.2d 207]; *Semole* v. *Sansoucie* (1972) 28 Cal.App.3d 714, 718 [104 Cal.Rptr. 897]; see 4 Witkin, Cal. Procedure, *supra*, Pleading, § 339, p. 437.) Santa Monica Beach, Ltd., has done that. There is no requirement that all evidence that might support the

paid would be a "judicial repeal" of the law. Unwilling to recognize our obligation to consider whether a once valid law may over time or in light of changed circumstances no longer advance its purpose, the majority defer to legislative judgment in justification of its refusal to permit this action to go to trial. None of the majority's reasons supports the result they reach.

A. *Deference.*

Plaintiff's claim that the Santa Monica ordinance has not substantially advanced the legislative purpose is not a facial attack on the Santa Monica ordinance. Nor is it a traditional "as applied" attack claiming that a newly enacted ordinance may not be applied to plaintiff's property without compensation. Instead plaintiff assumes the initial validity of the law on its face and as applied, and claims that the ordinance has not substantially advanced the purpose the enacting body believed would justify restricting the rights of rental property owners. For purposes of analyzing the merits of this claim it is not necessary to pigeonhole this plaintiff's claim as a "facial challenge" or an "as applied challenge" because, as I have suggested above, deference to the legislative judgment that the means selected in a land use regulation to achieve a public welfare goal will achieve that goal is not warranted in any takings clause claim.

Deference to the legislative body's choice of means by which to achieve a public welfare goal is generally required not only to maintain proper balance under the separation of powers doctrine, but also in recognition that a legislative body seeking a solution to problems affecting the public welfare must be afforded a reasonable opportunity to experiment with possible solutions. The reasons for and importance of judicial deference for this purpose are perhaps best expressed by Justice Brandeis, albeit in dissent, in *New State Ice Co.* v. *Liebmann, supra,* 285 U.S. 262: "There must be power in the States and the Nation to remould, through experimentation, our economic practices and institutions to meet changing social and economic needs. . . . [¶] To stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the Nation. It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country. The Court has the power to prevent an experiment. We may strike down the statute which embodies it on the ground that, in our opinion, the measure is arbitrary, capricious or unreasonable. We have power to do this, because the due process clause has been

claim be recited in the complaint. A plaintiff may obtain additional evidence after the filing of the complaint.

held by the Court applicable to matters of substantive law as well as to matters of procedure. But, in the exercise of this high power, we must ever be on our guard, lest we erect our prejudices into legal principles." (285 U.S. at p. 311 [52 S.Ct. at pp. 386-387] (dis. opn. of Brandeis, J.), fn. omitted.)

When a claim for just compensation is made under the takings clause, however, deference is neither appropriate nor permitted. Under our system of government, the court, not the legislative body or the electorate, must determine whether governmental action impermissibly invades rights protected by the constitution. "As stated by this Court in *West Virginia State Bd. of Educ.* v. *Barnette*, 319 U.S. 624, 638 [63 S.Ct. 1178, 1185, 87 L.Ed. 1628, 147 A.L.R. 674], 'One's right to life, liberty, and property . . . and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.' A citizen's constitutional rights can hardly be infringed simply because a majority of the people choose that it be." (*Lucas* v. *Colorado Gen. Assembly* (1964) 377 U.S. 713, 736-737 [84 S.Ct. 1459, 1473-1474, 12 L.Ed.2d 632], fns. omitted.) While the court may defer to the judgment of a legislative body or the electorate that a rent control ordinance is necessary to address a social or economic problem, the court may not do so when it is claimed that the impact of the ordinance is a compensable taking.

A claim based on the theory that just compensation is due because a rent control ordinance has not substantially advanced the legislative purpose advanced in justification of the resulting restriction of property owner's rights is one of first impression in this court. It is not novel, however. The Supreme Court recognized that an owner of rent-controlled property may offer evidence to demonstrate that the circumstances which once justified imposition of rent control no longer do so in *Chastleton Corp.* v. *Sinclair, supra*, 264 U.S. 543. There a Fifth Amendment-based challenge to a rent control order was brought after the war emergency which initially justified rent control allegedly had ended. The rent control order had been made under the authority of statute purporting to extend the act upheld in *Block, supra*, 256 U.S. 135. In a context closely analogous to the instant case the court said: "The order, although retrospective, was passed some time after the latest statute, and long after the original act would have expired. In our opinion it is open to inquire whether the exigency still existed upon which the continued operation of the law depended. It is a matter of public knowledge that the Government has considerably diminished its demand for employees, that was one of the great causes of the sudden afflux of people to Washington, and that other causes have lost at least much of their power. It is conceivable that, as is shown in an affidavit attached to the bill, extensive activity in building has added to the ease of finding an abode. If about all

that remains of war conditions is the increased cost of living that is not in itself a justification of the act. Without going beyond the limits of judicial knowledge, we can say at least that the plaintiffs' allegations cannot be declared offhand to be unmaintainable, and that it is not impossible that a full development of the facts will show them to be true. In that case the operation of the statute would be at an end." (264 U.S. at p. 548 [44 S.Ct. at p. 406].)

It seems clear, therefore, that plaintiff may pursue its claim that the Santa Monica ordinance has not substantially advanced the legislative purpose and must be allowed to introduce evidence to support its claim. When plaintiff does so the evidence must be weighed by the trier of fact. There is no room for deference in this factual determination.

*Nollan* and *Dolan* confirm that the "substantially advance" test is not a standard of review, but a fact-based inquiry.[10] Both assessed administrative application of land use regulations to a particular property. Neither gave any

---

[10]The majority's willingness to defer to legislative judgment in this case is curious. In *Professional Engineers* v. *Department of Transportation* (1997) 15 Cal.4th 543 [63 Cal.Rptr.2d 467, 936 P.2d 473], a majority of this court refused to defer to legislative judgment, but here the majority see no inconsistency in refusing to permit this plaintiff to offer evidence that the Santa Monica ordinance does not substantially advance the legislative purpose. They attempt to distinguish this case as one involving neither a "fundamental" right nor a constitutional provision that has been "construed to prohibit a certain type of government action absent specific factual findings."

The popular view that property rights receive a lesser degree of constitutional protection because they are not "fundamental" is itself suspect. Protection against taking without due process or just compensation has been accorded to property rights under the United States Constitution since 1791 when the Fifth Amendment was ratified as part of the Bill of Rights. The same protections have existed in California since this state joined the Union in 1850, set out in the Declaration of Rights (art. I) of both the 1849 and the 1879 California Constitutions. Nothing in either the federal or the state Constitution suggests an understanding that property rights are inferior to other rights accorded constitutional protection or that the drafters did not consider property rights as "fundamental" as the other rights sought to be protected. Indeed, the tenor of the time suggests otherwise. (See *Calder* v. *Bull* (1798) 3 U.S. (3 Dall.) 386, 388 (opn. of Chase, J.) ["An act of the legislature (for I cannot call it a law), contrary to the great first principles of the social compact, cannot be considered a rightful exercise of legislative authority. . . . [¶] . . . a law that takes property from A. and gives it to B: it is against all reason and justice, for a people to entrust a legislature with such powers; and, therefore, it cannot be presumed that they have done it."].)

Nonetheless, a judicially created hierarchy has relegated property rights to a second class status which, it is claimed, justifies a distinction between property rights and "fundamental" rights when the validity of legislation impinging on constitutional rights is called into question. Although constitutionally unsupportable, this distinction persists in decisions of this court and the United States Supreme Court and underlies much of the reasoning and analysis of the majority.

In my view the right to just compensation for property taken by the government is very fundamental. Be that as it may, however, a claim for just compensation made under the takings clause as construed in *Agins*, and applied in *Nollan* and *Dolan*, does require specific

deference to or even considered whether the original legislative judgment that the enabling legislation would advance the legislative body's stated purpose was reasonable. Instead both *Nollan* and *Dolan* recognized that in an "as applied" challenge under the takings clause, the state bears the burden of demonstrating that the fit or nexus between the legislative goal and application of the law to the property in question meets the constitutional standard for an uncompensated taking, i.e, that the regulation substantially advances that goal. (*Dolan, supra,* 512 U.S. at p. 386 [114 S.Ct. at p. 2317]; *Nollan, supra,* 483 U.S. at p. 837 [107 S.Ct. at pp. 3148-3149].)

The "substantially advance" test thus establishes an evidentiary burden the government must carry in the trial court or administrative proceeding to justify application of a land use regulation to an individual parcel of property, not a standard of judicial review or level of judicial scrutiny. To the extent that a standard of review by an appellate court is implicated the law is settled. Because the claim involves taking a vested right in property the court must exercise its independent judgment on the evidence. (*Halaco Engineering Co.* v. *South Central Coast Regional Com.* (1986) 42 Cal.3d 52, 64, fn. 10 [227 Cal.Rptr. 667, 720 P.2d 15].) Here, therefore, the court must exercise its independent judgment in determining whether plaintiff has demonstrated that the Santa Monica ordinance has not substantially advanced the purpose offered by the city in justification of the restriction on plaintiff's property rights. That can be done only after plaintiff is allowed to present evidence on the question.

The takings clause permits no less as demonstrated by *Nollan* and *Dolan* where the court did not defer to legislative judgment in an "as applied" challenge and *Agins* in which it did not do so in a facial challenge to restrictions on property rights. Instead in *Nollan, supra,* 483 U.S. at page 838 [107 S.Ct. at page 3149], and *Dolan, supra,* 512 U.S. at page 395 [114 S.Ct. at pages 2321-2322], the court held, based on the evidence, evidence that the majority will not permit plaintiff to offer here, that the nexus between the property restriction and the legislative goal did not meet the constitutional mandate that the restriction substantially advance that goal. Therefore the restriction was a compensable taking. In *Agins, supra,* 447 U.S. at page 462 [100 S.Ct. at page 2291], the court held that the zoning ordinance in question

---

factual findings. Indeed, as the majority recognize elsewhere (maj. opn., *ante,* at p. 964), determining whether a taking occurs under a land use regulation requires " 'essentially ad hoc, factual inquiries.' " (*Lucas* v. *South Carolina Coastal Council, supra,* 505 U.S. at p. 1015 [112 S.Ct. at p. 2893].) By characterizing the question presented here as the extent to which the government may regulate rent increases, the majority avoid this inescapable conclusion. The issue here is not the extent to which rents may be regulated. It is whether the regulation imposed by the Santa Monica ordinance constitutes a taking because it does not substantially advance the legislative purpose. That is a factual question.

there did not, in fact, prevent the best use of the affected land or extinguish a fundamental attribute of ownership.

The majority are correct in holding that *generally* when a *facial* challenge to the validity of a statute is made on the ground that a legislative body has exceeded the proper scope of the police power, the role of the court is simply to determine whether (1) the legislative body has identified the existence of a problem affecting the health, safety, or general welfare of the public, thus justifying exercise of the police power to regulate individual conduct, and (2) has selected means reasonably related to achieving the legislative goal. In those inquiries deference to the legislative body's findings and judgment is proper. Deference is not appropriate or permitted when the statute is challenged as violative of the takings clause, however. As I have shown, *Nollan*, *supra*, 483 U.S. 825, and *Dolan*, *supra*, 512 U.S. 374, do not support the contrary conclusion reached by the majority.

Moreover, the nature of the inquiry mandated by the takings clause precludes another aspect of the analysis by which the majority rejects plaintiff's claim. When determining if the restriction on the property owner's rights substantially advances the legislative goal, the inquiry of necessity requires that the stated goal of the legislative body be the object of the inquiry. The court may not, as the majority do, follow due process jurisprudence to uphold uncompensated application of a land use regulation on the ground that the regulation serves another purpose. When a law restricting property rights without affording compensation has a stated goal, the judiciary is under no compulsion and has no authority to uphold the continued denial of compensation on the basis that the law might serve another unstated legislative goal. Were that the rule, it would be an open invitation to judicial legislation, and the "substantially advance" test enunciated in *Agins* would be meaningless. *Agins* assumes that the legislative purpose to be advanced by a land use regulation is that contemplated by the body which enacted the regulation.

Additionally, even when a property regulation passes the "substantially advance" test, compensation may be required. In a challenge based on the takings clause the court must also independently determine whether the law goes too far. "The determination that governmental action constitutes a taking is, in essence, a determination that the public at large, rather than a single owner, must bear the burden of an exercise of state power in the public interest." (*Agins*, *supra*, 447 U.S. at p. 260 [100 S.Ct. at p. 2141]; see also *Nollan*, *supra*, 483 U.S. at p. 835, fn. 4 [107 S.Ct. at p. 3148].) This mixed question of law and fact cannot be resolved through deference to the legislative judgment. Instead, whether a land use regulation goes too far

requires, as the high court explained in *Penn Central, supra,* 438 U.S. 104, an ad hoc factual determination in every case to determine whether the regulation forces a property owner to bear public burdens which in fairness and justice should be borne by the public. In a takings clause challenge to the facial validity of a law regulating private property, the court may first inquire whether the regulation is a permissible exercise of the police power. Only in that inquiry, basically a due process inquiry, is deference to legislative findings appropriate. *Agins* established the standard of review to be applied to the additional inquiries a court must undertake when the takings clause is invoked, however—whether the property rights restriction will "substantially advance" the legislative goal *and* whether the regulation goes too far and imposes public burdens on the property owner. These factual questions do not permit a deferential inquiry.

Nowhere in the majority opinion is there a critical examination of whether, in light of the facts alleged, the Santa Monica rent control ordinance has *substantially* advanced the purpose offered by the legislative body in justification of the restrictions the ordinance places on owners of rental property.

I conclude that the facts alleged in the complaint are sufficient to state a cause of action on the theory that the Santa Monica rent control ordinance has not substantially advanced its purpose, and, as discussed below, on the theory that it imposes on owners of rental property a burden that should be borne by the general public. The complaint does state a cause of action in inverse condemnation.

The majority's conclusion that the complaint fails to state a cause of action because plaintiff does not allege that that the Santa Monica ordinance has failed to substantially advance the broad legislative purpose of protecting *all* tenants of rental property also lacks merit. If plaintiff can show that the principal goal of the legislation—preserving affordable housing for low-income tenants, minorities, families with children, and the elderly—has not been met, it cannot be said that the law has *substantially* advanced the legislative purpose simply because some tenants now benefit.[11]

---

[11]It might not be inappropriate to take judicial notice that tenants well able to afford market rents continue to occupy rent-controlled apartments in Manhattan for their lifetimes, paying only a few hundred dollars for apartments that would rent for thousands in a free market. In some cities, including Santa Monica, would-be tenants pay thousands of dollars in "key money" to landlords for the right to rent desirable units, agreeing also to make all repairs, knowing that once they become tenants they will not have to pay market rent and cannot be evicted. With regard to the impact of rent control in Santa Monica in particular, see

B. *Judicial "Repeal."*

As noted above, the plaintiff here does not seek to invalidate the Santa Monica ordinance. It seeks only just compensation for application of the ordinance to its property. A holding that compensation must be paid would not repeal the ordinance.

Moreover, a land use regulation which has a legitimate governmental purpose may be valid notwithstanding a conclusion that compensation must be paid because the regulation goes too far. The property may be taken or the property right restricted under the regulation, but just compensation must be paid when the regulation is applied.

This is so because the takings clause does not bar a governmental taking of private property. (*First Lutheran Church* v. *Los Angeles County, supra,* 482 U.S. at p. 315 [107 S.Ct. at p. 2386]; *Williamson Planning Comm'n* v. *Hamilton Bank* (1985) 473 U.S. 172, 195 [105 S.Ct. 3108, 3121, 87 L.Ed.2d 126]; *Hodel* v. *Virginia Surface Mining & Recl. Assn., supra,* 452 U.S. at p. 297, fn. 40 [101 S.Ct. at p. 2371].) The due process clause does so if there is no proper governmental purpose, but the takings clause simply mandates that

---

Wilkinson, *Death Threats and Long Waiting Lists, Santa Monica: A House Divided by Rent Control,* Los Angeles Times (Apr. 29, 1989) page 1-1, column 1.

When rent control becomes this perverted, it can hardly be said that it has substantially advanced its purpose.

Moreover, empirical studies of rent control in several United States cities, including Santa Monica, have shown that far from mitigating the shortage of affordable housing, in rent-controlled cities the supply of affordable housing has been reduced, harsh costs have been imposed on the groups the Santa Monica ordinance particularly seeks to protect, and both the quantity and quality of rental housing in those cities has decreased. (See Radford, *supra,* 6 Fordham Envtl. L.J. at pp. 669-770, and authorities cited.) The author observes: "A sizable body of research suggests that rent control not only reduces the available stock of affordable housing, but also redistributes this dwindling supply regressively within the population of renters. [¶] In California, rent control has tended to be adopted in cities with relatively wealthy electorates. The demographic evidence has never supported the claim that rent control was adopted in these cities to ease the burdens of the poor. Instead . . . 'the major beneficiary of regulatory controls in each case was (and still is) a population that is firmly entrenched in the middle class.' " (*Id.* at pp. 770-771, fns. omitted.)

The assumption of the majority that the political process is adequate to correct any injustice to owners of rental property subject to rent control reflects a startling naivete for a court that sits in a rent-controlled city in which a substantial majority of voters are renters. It is axiomatic, of course, that the protections embodied in the Bill of Rights exist to ensure that majoritarian preference will not suffice to deny citizens those rights. "The sovereignty of the people is itself subject to those constitutional limitations which have been duly adopted and remain unrepealed." (*Hunter* v. *Erickson* (1969) 393 U.S. 385, 392 [89 S.Ct. 557, 561, 21 L.Ed.2d 616]; see also *Eastlake* v. *Forest City Enterprises, Inc., supra,* 426 U.S. at p. 676 [96 S.Ct. at p. 2363]; *Lucas* v. *Colorado Gen. Assembly, supra,* 377 U.S. 713, 736-737 [84 S.Ct. 1459, 1474]; *West Virginia State Board of Education* v. *Barnette* (1943) 319 U.S. 624, 638 [63 S.Ct. 1178, 1185, 87 L.Ed. 1628, 147 A.L.R. 674].)

just compensation be paid if property is taken or physically invaded, if a regulation of property goes too far, or if a regulation does not substantially advance the governmental purpose.

Assuming arguendo that the complaint does seek invalidation of the ordinance or that invalidation would be the inevitable result of finding that it has not substantially advanced its purpose, there would be no basis for the majority's concern that judicial recognition that the rent control ordinance takes property without just compensation would be an impermissible or unprecendented judicial repeal of the ordinance.

The majority position reflects an erroneous view of the proper role of the judiciary. Reviewing legislation to ensure that the law does not offend the Constitution has been recognized as a proper exercise of the judicial role for almost 200 years, since *Marbury* v. *Madison, supra*, 5 U.S. (1 Cranch) 137. As the Supreme Court recognized there, determining the constitutional validity of legislation "is of the very essence of judicial duty." (*Id.* at p. 176.)

This duty is not confined to assessing the constitutional validity of legislation or its application at the time of its enactment. The United States Supreme Court has rejected the majority's restrictive view of the judicial role, one which fails to acknowledge the power and duty of the court to reconsider the validity of a law in light of actual experience with its operation. The high court did so in *Chastleton Corp.* v. *Sinclair, supra*, 264 U.S. 543 (*Chastleton*), when asked to consider if the emergency conditions created by World War I still existed in the District of Columbia and thus continued to justify rent control. In so doing it stated: "A law depending upon the existence of an emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change even though valid when passed. *Perrin* v. *United States* [(1914)] 232 U.S. 478, 486, 487 [34 S.Ct. 387, 58 L.Ed. 691]. *Missouri* v. *Chicago, Burlington & Quincy R.R. Co.* [(1916)] 241 U.S. 533, 539, 540 [36 S.Ct. 715, 60 L.Ed. 1148]." (264 U.S. at pp. 547-548 [44 S.Ct. at p. 406].) The court's remand to the District of Columbia courts for an evidentiary proceeding where the facts could more conveniently be "accurately ascertained and carefully weighed" and "preserved so that if necessary it can be considered by this Court" (*id.* at p. 549 [44 S.Ct. at p. 406]) confirms that the judiciary has both the power and the obligation to consider evidence of changed conditions and, where necessary, to declare a law invalid.

The majority dismiss *Chastleton, supra*, 264 U.S. 543, as a questionable precedent, apparently finding it relevant only to whether rent control is permissible absent emergency conditions. The decision stands for a more

important principle, however—the duty of the court to consider changed conditions in assessing the *continued* validity of a law that restricts property rights or, as here, to whether a regulation of property has over time failed to substantially further its purpose. Unwilling to assume that duty, the majority claim it would be too difficult to decide when such a claim should be entertained and assert that the court's power to invalidate a statute on the basis of changed conditions is narrowly circumscribed. Of course, the difficulty of decisionmaking cannot justify abdication of judicial duty. The majority give no reason other than avoiding judicial "activism" for concluding that this plaintiff's claim does not fall within the narrowly circumscribed judicial power to declare invalid a statute which impermissibly impinges on constitutional rights.

The *Chastleton* rule is neither suspect or circumscribed in the manner suggested by the majority. *Abie State Bank* v. *Bryan* (1931) 282 U.S. 765 [51 S.Ct. 252, 75 L.Ed. 690] is to the same effect. There the validity of a statute authorizing special assessments made under a state statute had been upheld against a takings clause challenge before the plaintiffs brought the action then before the court to enjoin collection of the assessment. The high court rejected a challenge based on the prior adjudication of validity stating: "As to the first objection, it is sufficient to say that the Bank Guaranty Law was sustained by this Court as a police regulation [citations] and that a police regulation, although valid when made, may become, by reason of later events, arbitrary and confiscatory in operation. [Citations.] In the *Shallenberger* case [*Shallenberger* v. *First State Bank of Holstein* (1911) 219 U.S. 114 [31 S.Ct. 189, 55 L.Ed. 117]], *the suit was brought immediately upon the enactment of the law, and that decision sustaining the law cannot be regarded as precluding a subsequent suit for the purpose of testing the validity of assessments in the light of the later actual experience.*" (282 U.S. at p. 772 [51 S.Ct. at p. 255], italics added; see also *Nashville, C. & St. L. Ry.* v. *Walters* (1935) 294 U.S. 405, 415 [55 S.Ct. 486, 79 L.Ed. 949] ["A statute valid as to one set of facts may be invalid as to another. A statute valid when enacted may become invalid by [a] change in the conditions to which it is applied." (Fns. omitted.)].)

This court, too, has recognized that the initial validity of a statute does not preclude a subsequent challenge to its continued validity. "[*I*]*n the absence of a constitutional objection* . . . the courts have no right to declare a statute obsolete by reason of a supervening change in the conditions under which it was enacted." (*Palermo* v. *Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 63 [195 P.2d 1], italics added.) "'A change of conditions may invalidate a statute which was reasonable and valid when enacted.' (*Perez* v. *Sharp* (concurring opinion) [(1948)] 32 Cal.2d 711, 737 [198 P.2d 17].) Also, due

weight must be given to new and changed conditions. (*Skalko* v. *City of Sunnyvale* [(1939)] 14 Cal.2d 213, 216 [93 P.2d 93]; *Bernstein* v. *Smutz* [(1947)] 83 Cal.App.2d 108 [188 P.2d 48]; *Endara* v. *City of Culver City*, 140 Cal.App.2d 33 [294 P.2d 1003].)" (*Gaylon* v. *Municipal Court* (1964) 229 Cal.App.2d 667, 671-672 [40 Cal.Rptr. 446].)

*Skalko* v. *City of Sunnyvale* (1939) 14 Cal.2d 213 [93 P.2d 93] (*Skalko*), which the majority concede is relevant, applies this rule to a zoning ordinance which, because of changed conditions over a period of time, no longer carried out the legislative intent and, in the view of this court, had become confiscatory. We held there that "the police power must be applied to existing conditions. [Citation.] 'The principle that a police regulation, valid when adopted, may become invalid because in its operation it has proved to be confiscatory, carries with it the recognition of the fact that earlier compliance with the regulation does not forfeit the right of protest when the regulation becomes intolerable'. (*Abie State Bank* v. *Bryan*, 282 U.S. 765.) When conditions have changed since the legislative action was taken, 'statutes and ordinances, which, after giving due weight to the new conditions are found clearly not to conform to the Constitution, of course, must fall'. [Citation.] The question, therefore, is whether under the facts shown by the appellant his rights are now being invaded by the existence and maintenance of the ordinance." (14 Cal.2d at p. 216.)

Contrary to the majority, I conclude that the same rule must apply when a statute that was a valid exercise of the police power when enacted, because it was reasonably designed to achieve a proper governmental purpose, but would otherwise impermissibly infringe on private property rights, is shown after a reasonable period of implementation to fail to achieve that purpose. Although *Skalko* was an "as applied" challenge to the continued validity of the zoning ordinance, there is no reason that the rule should not be equally applicable to a challenge like this to the continued application, without just compensation, of a rent control ordinance that does not achieve the legislative purpose that justified it.

Plaintiff has brought such a challenge. It has alleged facts to support its claim that the Santa Monica rent control ordinance has not achieved the legislative purpose that justified it. If so, just compensation must be paid if the law is to continue to be applied. I find it remarkable that the majority justify their refusal to follow *Chastleton* and *Skalko* to enforce the takings clause on the ground that carrying out the court's constitutional duty would force the court into an activist role. Two centuries of jurisprudence since *Marbury* v. *Madison, supra,* 5 U.S. (1 Cranch) 137, have escaped notice. Apparently questions of first impression will no longer be entertained lest their resolution propel the court into an activist role.

V

*The Complaint Also States Facts to Show That the Santa Monica Rent Control Ordinance Goes "Too Far"*

Rent control is not simply a species of price control subject to a due process-type analysis like that undertaken by the majority. The analytical focus in assessing whether rent control constitutes a taking for which the takings clause of the Fifth Amendment mandates just compensation must be directed to the means by which rent control accomplishes its purpose. The Santa Monica rent control ordinance takes from the property owner the right to charge market rent for the owner's property and by so doing compels the owner to subsidize the tenant. It depresses the value of the rent-controlled property. Under a scheme like that before the court the tenant is given the right to occupy the owner's property for an indefinite period. Finally, except to the extent it has been superseded by state law (see Gov. Code, § 7060 et seq.), the Santa Monica ordinance restricts the ability of the owner to turn the property to other uses.

Even when the public purpose of rent control, that of ensuring a supply of affordable housing, is achieved, the property owner does not receive a reciprocal benefit corresponding to or justifying the restriction on the owner's property rights. Thus, the property owner is forced to bear the burden of providing affordable rental housing to those tenants unable to pay market rents, a burden that in justice should be borne by the community as a whole. This burden is not imposed on the property owner because rent control is the only or even the best means of ensuring affordable housing. Governmental rent subsidies and/or government assistance in creating affordable housing through new construction or rehabilitation of existing, underutilized structures can achieve the same end while better ensuring that the low-cost housing thereby created is occupied by persons who most need assistance with rent. When a city resorts to those alternatives, the public bears the burden as the cost is shared by all through taxes. A city which opts instead for rent control to achieve its purpose puts what should be recognized and assumed as a public burden on the owner of rental property.

None of this is true of other forms of price control. While they, too, restrict an investor's right to maximize the return on the investment, they do not control the use or disposition of the property in which the investment is made. No individual is given the right to use property owned by another. Under price control the owner may destroy and/or turn the property that generates the controlled item to other uses. No individual is directly subsidized by the price restriction and the public as a whole, not solely the

individuals who use the investor's product, benefits. Therefore, while there may be some burden on use of the income-generating property, and the takings clause may not require that just compensation be paid when other forms of price control are instituted, those types of price control are not analogous to rent control.

The majority not only abdicate the judicial role by refusing to assess whether the Santa Monica ordinance has substantially advanced its declared purpose, they also fail to recognize the court's duty to assess whether the various restrictions the Santa Monica ordinance has imposed on the owners of rental property in using that property go too far by imposing on owners of rental property the burden of subsidizing tenants.

The complaint in this action states facts to establish a taking without payment of just compensation to owners of rental property in violation of the takings clause on this ground. The Santa Monica rent control ordinance causes a taking for which compensation must be paid because it imposes on owners of rental property a burden that in fairness and justice should be borne by the public as a whole. The ordinance compels the owners of rental property to subsidize the housing costs of their tenants, denies owners the option of turning the property to other uses, and invests the tenants with lifetime occupancy rights—all for the purpose of providing a supply of "affordable" rental housing for tenants.

For those reasons the Santa Monica ordinance does not withstand scrutiny under the standards by which a court determines whether a land use regulation goes too far. Regardless of how the factors the Supreme Court has indicated are relevant to that determination are weighed, the law cannot satisfy the ultimate test—does it impose on owners of rental property a burden that in justice and fairness should be borne by the public as a whole. Santa Monica may not compel the owners of grocery stores to subsidize their needy customers. Subsidizing rent or other necessities of life for persons in need of financial assistance is a public responsibility to be financed through general tax revenues. It is not an obligation of owners of rental property. The city has no right to shift the burden of subsidizing housing to the owners of rental property.

Application of the *Penn Central* and "reciprocity of advantage" factors leads to the same conclusion—the Santa Monica rent control ordinance goes too far. The ordinance has a significant economic impact on a property owner, not only through devaluation of the controlled property, but also in compelling the owner to forego market rate rental income. In addition to taking from the owner the right to have rents determined by market forces,

the Santa Monica law takes the right to terminate tenancies and select new tenants, and even the right to go out of the rental business short of simply leaving the property unoccupied. The ordinance totally frustrates the investment-backed expectations of any owner who invests in rental property, and particularly those who owned property before the law was enacted.

The character of the governmental action—controlling rent in order to forestall excessive and exorbitant rent increases—may have a proper governmental purpose insofar as it assists persons unable to afford safe and decent housing, but to achieve that purpose the law requires private property owners to subsidize their tenants. That is a burden that in fairness and justice should be borne by the community as a whole. "[R]ent control obviates the need to put public money behind public measures." (Jones, *Confiscation: A Rationale of the Law of Takings* (1995) 24 Hofstra L.Rev. 1, 84.) And, as noted above, the Santa Monica ordinance compels owners of rental property to subsidize even the wealthy.

Finally, there is no "reciprocity of advantage" whatsoever in being subject to the Santa Monica rent control ordinance. The community benefits because Santa Monica is able to provide "affordable" housing without using general tax revenues to do so. This is not comparable to the community benefit generated by zoning laws and similar land use restrictions which enhance the value of many, if not most, properties and protect the quality of life for all residents, however. Under the Santa Monica ordinance the benefits all flow one way, to the tenant who is subsidized and the taxpayers who are relieved of the burden of providing affordable housing through general tax revenues. The owner of rental property, on the other hand, receives no benefit from the rent control ordinance and the value of the rent-controlled property declines.

"The traditional manner in which American government has met the problem of those who cannot pay reasonable prices for privately sold necessities—a problem caused by the society at large—has been the distribution to such persons of funds raised from the public at large through taxes, either in cash (welfare payments) or in goods (public housing, publicly subsidized housing, and food stamps). Unless we are to abandon the guiding principle of the Takings Clause that 'public burdens . . . should be borne by the public as a whole,' *Armstrong*, 364 U.S., at 49, this is the only manner that our Constitution permits. The fact that government acts through the landlord-tenant relationship does not magically transform general public welfare, which must be supported by all the public, into mere 'economic regulation,' which can disproportionately burden particular individuals." (*Pennell* v. *San Jose, supra,* 485 U.S. 1, 21-22 [108 S.Ct. 849, 863] (dis. opn. of Scalia, J.).)

Although Justice Scalia was addressing a provision of the San Jose rent control ordinance which permitted the administrators to consider tenant hardship in fixing rents, and he assumed the validity of rent control to prevent excessive rent, his reasoning is equally applicable to rent control in general. The Santa Monica rent control ordinance forces owners of rental property to bear what should be a public burden. It thus creates a taking of property from any owner of rental property to which it is applied, a taking for which the takings clause mandates just compensation.

I would affirm the judgment of the Court of Appeal.

**CHIN, J.** Dissenting.—The majority, in analyzing this case, inappropriately conflates takings jurisprudence with due process jurisprudence, thus undoing much of our effort in *Kavanau* v. *Santa Monica Rent Control Bd.* (1997) 16 Cal.4th 761 [66 Cal.Rptr.2d 672, 941 P.2d 851] to disentangle these two areas of law. It cites due process cases, though we are addressing a takings clause challenge to Santa Monica's rent control law (see, e.g., maj. opn., *ante*, at pp. 967-968), and it ultimately applies a due process standard (*id.* at pp. 967-968, 972). If the majority were to adhere to the standards applicable under the takings clause, instead of trying to alchemize those standards into due process standards, I believe it would conclude, as I do, that plaintiff has adequately stated a cause of action. Accordingly, I dissent.

The due process clauses of the state and federal Constitutions guarantee property owners "due process of law" when the state "deprive[s] [them] of . . . property." (U.S. Const., 14th Amend., § 1; Cal. Const., art. I, §§ 7, 15.) On the other hand, the takings clauses of the state and federal Constitutions guarantee property owners "just compensation" when their property is "taken for public use." (U.S. Const., 5th Amend.; Cal. Const., art. I, § 19.) Although these constitutional provisions are facially similar, they limit the legislative power of government in different ways, and they have given rise to two separate, though sometimes overlapping, bodies of law.

Among other things, the due process guaranty prohibits regulations that are "arbitrary" or "discriminatory" or lacking "a reasonable relation to a proper legislative purpose." (*Nebbia* v. *New York* (1934) 291 U.S. 502, 537 [54 S.Ct. 505, 516, 78 L.Ed. 940, 89 A.L.R. 1469].) This standard is often referred to as the "rational basis" test because "regulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional [under the due process clause] unless . . . it is of such a character as to preclude the assumption that it rests upon *some rational basis* within the knowledge and experience of the legislators." (*U.S.* v. *Carolene Products Co.* (1938) 304 U.S. 144, 152 [58 S.Ct. 778, 783, 82 L.Ed. 1234], italics added;

see also *Washington* v. *Glucksberg* (1997) 521 U.S. 702, 727-735 [117 S.Ct. 2258, 2271-2275, 138 L.Ed.2d 772].) As the words suggest, the rational basis test is highly deferential to legislative prerogative. Under that test, the government does not need to offer any evidentiary proof in defense of a regulation, and opponents of the regulation cannot defeat it "merely by tendering evidence in court that the legislature was mistaken." (*Minnesota* v. *Clover Leaf Creamery Co.* (1981) 449 U.S. 456, 464 [101 S.Ct. 715, 724, 66 L.Ed.2d 659].)

The formulations applicable under the takings clause are, by comparison, quite different. Recent United States Supreme Court decisions emphasize a two-part analysis that focuses on the regulation's economic effect and the government's purpose. (*Yee* v. *Escondido* (1992) 503 U.S. 519, 523 [112 S.Ct. 1522, 1526, 118 L.Ed.2d 153]; *Keystone Bituminous Coal Assn.* v. *DeBenedictis* (1987) 480 U.S. 470, 484-485 [107 S.Ct. 1232, 1241, 94 L.Ed.2d 472].) Under both the "effect" and the "purpose" sides of the analysis, the court has identified an extreme at which the regulation constitutes a per se taking requiring compensation. Thus, where the regulation's economic effect is total—that is, where it deprives a property owner of "all economically beneficial or productive use of land"—it constitutes a per se taking. (*Lucas* v. *South Carolina Coastal Council* (1992) 505 U.S. 1003, 1015 [112 S.Ct. 2886, 2893, 120 L.Ed.2d 798]; *Agins* v. *Tiburon* (1980) 447 U.S. 255, 260 [100 S.Ct. 2138, 2141, 65 L.Ed.2d 106].) Similarly, where the regulation's purpose is purely sophistic—that is, where it does not in fact " 'substantially advance' the 'legitimate state interest' sought to be achieved"—it also constitutes a per se taking. (*Nollan* v. *California Coastal Comm'n* (1987) 483 U.S. 825, 834, fn. 3 [107 S.Ct. 3141, 3147, 97 L.Ed.2d 677] (*Nollan*); see also *Dolan* v. *City of Tigard* (1994) 512 U.S. 374, 385 [114 S.Ct. 2309, 2316, 129 L.Ed.2d 304] (*Dolan*); *Lucas* v. *South Carolina Coastal Council, supra,* 505 U.S. at p. 1016 [112 S.Ct. at p. 2894]; *Keystone Bituminous Coal Assn.* v. *DeBenedictis, supra,* 480 U.S. at p. 485 [107 S.Ct. at p. 1241]; *United States* v. *Riverside Bayview Homes, Inc.* (1985) 474 U.S. 121, 126 [106 S.Ct. 455, 458-459, 88 L.Ed.2d 419]; *Agins* v. *Tiburon, supra,* 447 U.S. at p. 260 [100 S.Ct. at p. 2141].) The latter standard, to which I refer as the "substantially advance" standard, is thus simply the logical corollary of the former standard. In this case, plaintiff asks us to interpret and apply the "substantially advance" standard. The majority does so, but in a way that ignores the words of the standard and renders it a mere vacuous shell.

We as judges write judicial opinions and articulate legal standards because we believe that words, though imperfect, have the power to convey objective meaning. And if words have that power, then a requirement that a law

" 'substantially advance' the 'legitimate state interest' sought to be achieved" (*Nollan, supra*, 483 U.S. at p. 834, fn. 3 [107 S.Ct. at p. 3147]) is different from a requirement that a law not be "arbitrary," and, of course, it is different from a requirement that a law have a "rational basis." Nevertheless, the majority grafts these deferential due process standards onto the "substantially advance" standard.

True, the majority does not actually take the final step of expressly equating the "substantially advance" standard with the rational basis test. But it does almost the same thing when it declares that rent control constitutes a taking only if it is "arbitrary." (Maj. opn., *ante*, at pp. 967, 972.) I fail to see a practical difference between the majority's "rent control may not be arbitrary" rule and the rational basis test. If a law is not arbitrary, it is rational; if it is rational, it is not arbitrary. Thus, not surprisingly, due process cases frequently use the term "arbitrary" as a synonym for the lack of a rational basis. (See, e.g., *Carolene Products Co.* v. *U.S.* (1944) 323 U.S. 18, 31-32 [65 S.Ct. 1, 8, 89 L.Ed. 15, 155 A.L.R. 1371].) Moreover, the majority hints that the rational basis test probably applies here. (Maj. opn., *ante*, at p. 967.)

In *Nollan*, however, the high court unambiguously affirmed that the "substantially advance" standard is distinct from the rational basis test. (*Nollan, supra*, 483 U.S. at p. 834, fn. 3 [107 S.Ct. at p. 3147].) In an impressive display of judicial sleight of hand, the majority deftly explains away this language, stating that the "substantially advance" standard is actually not a single standard, but rather incorporates "different levels of takings scrutiny" (maj. opn., *ante*, at p. 966) that in *Nollan* meant one thing, but here mean near total deference to the Legislature. I disagree. Though the "substantially advance" standard might be applied with particular care in certain types of cases (*Nollan, supra*, 483 U.S. at p. 841 [107 S.Ct. at pp. 3150-3151]), it remains a single standard, not a multilevel standard that has a fluid meaning completely divorced from the natural meaning of the words that comprise it.

The majority cites footnote 8 in *Dolan, supra*, 512 U.S. at page 391 [114 S.Ct. at page 2320], as proof that, in this case, the "substantially advance" standard is no different from the "not arbitrary" standard applicable in due process cases. That footnote, however, hardly purports to give content to the "substantially advance" standard. Rather, it addresses an argument in Justice Stevens's dissent concerning allocation of the burden of proof.

Justice Stevens argued that the burden of proof ought to rest on the party challenging the regulation, not on the governmental entity defending it.

(*Dolan, supra*, 512 U.S. at pp. 409, 411 [114 S.Ct. at pp. 2328-2330] (dis. opn. of Stevens, J.).) In support of his argument, Justice Stevens cited *Moore* v. *East Cleveland* (1977) 431 U.S. 494 [97 S.Ct. 1932, 52 L.Ed.2d 531], a due process case. (*Dolan, supra*, 512 U.S. at p. 409 [114 S.Ct. at pp. 2328-2329] (dis. opn. of Stevens, J.).) Justice Stevens does not say why he thought a due process case was relevant. In response to Justice Stevens, the *Dolan* court affirmed his assertion about the burden of proof in due process cases, but found it inapposite to the particular type of takings issue it was deciding. Thus, the court agreed with Justice Stevens that, "in evaluating most generally applicable zoning regulations, the burden properly rests on the party challenging the regulation to prove that it constitutes an arbitrary regulation of property rights." (*Id.* at p. 391, fn. 8 [114 S.Ct. at p. 2320].) But, in making this statement, the court was merely reiterating the appropriate due process standard to which Justice Stevens had alluded in his argument. The court might also have agreed with Justice Stevens about numerous other legal standards that similarly were not relevant. In any case, the court certainly would not have used a single sentence in a footnote responding to a dissent as the place to announce a new takings clause standard. Also, if the court had been discussing the takings clause, not the due process clause, it would not likely have followed its statement with a citation to *Euclid* v. *Ambler Co.* (1926) 272 U.S. 365 [47 S.Ct. 114, 71 L.Ed. 303], a due process case. (*Dolan, supra*, 512 U.S. at p. 391, fn. 8 [114 S.Ct. at p. 2320].)

In sum, the court's parenthetical discussion in *Dolan* of the burden of proof in due process cases cannot fairly be read as stating the proper standard applicable in takings cases.

I do not advocate a return to the era of *Lochner* v. *New York* (1905) 198 U.S. 45 [25 S.Ct. 539, 49 L.Ed. 937], when courts routinely struck down economic regulations under the due process clause, thereby inhibiting the ability of government to restore confidence to the marketplace and to prevent exploitation of those who have little bargaining power. Appropriate regulation can serve to foster, not tax, economic growth and social well-being by creating and maintaining an environment conducive to beneficial commerce. On the other hand, I *do* advocate judicial reasoning that is clear and credible. No fair assessment of the words, " 'substantially advance' the 'legitimate state interest' sought to be achieved" (*Nollan, supra*, 483 U.S. at p. 834, fn. 3 [107 S.Ct. at p. 3147]), can equate them with a rule that limits compensable "takings" of private property to government action that is "arbitrary." Moreover, we can apply the high court's "substantially advance" standard faithfully, while still maintaining the appropriate deference to legitimate government efforts to regulate the use of private property.

The majority decries as "novel" (maj. opn., *ante*, at p. 963) and "activist" (*id.* at p. 973) "[t]he notion that a court may invalidate legislation that it

finds, after a trial, to have failed to live up to expectations" (*id.* at p. 963). The majority adds that "[i]n our constitutional system, it is generally assumed that only the legislative body that enacted the statute may exercise a power of repeal if that statute fails to meet legislative expectations." (*Id.* at pp. 963-964.) But the trial that plaintiff requests here is hardly a new idea. It is simply applying in the context of economic regulation practices that are already quite standard with respect to social and moral regulation.

As a result of our decisions interpreting the privacy clause of the state Constitution (see, e.g., *American Academy of Pediatrics* v. *Lungren* (1997) 16 Cal.4th 307 [66 Cal.Rptr.2d 210, 940 P.2d 797] (*American Academy*); *Loder* v. *City of Glendale* (1997) 14 Cal.4th 846 [59 Cal.Rptr.2d 696, 927 P.2d 1200]; *Hill* v. *National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1 [26 Cal.Rptr.2d 834, 865 P.2d 633]), social and moral regulation is routinely subject to a trial evaluating the effectiveness of the regulation at achieving its goals. In *American Academy*, for example, we stated that "when a statute impinges upon a constitutional right, legislative findings with regard to the need for, or probable effect of, the statutory provision cannot be considered determinative for constitutional purposes." (*American Academy*, *supra*, 16 Cal.4th at pp. 349-350 (plur. opn. of George, C. J.); see also *id.* at p. 383 (conc. opn. of Kennard, J.).) Rather, "greater judicial scrutiny is required." (*Id.* at p. 349 (plur. opn. of George, C. J.); see also *id.* at p. 383 (conc. opn. of Kennard, J.); *Professional Engineers* v. *Department of Transportation* (1997) 15 Cal.4th 543, 569 [63 Cal.Rptr.2d 467, 936 P.2d 473].) We then expressly endorsed a procedure whereby the lower court did exactly what the majority decries: it "invalidate[d] legislation that it [found], after a trial, [would] fail[] to live up to expectations." (Maj. opn., *ante*, at p. 963; see *American Academy*, *supra*, 16 Cal.4th at pp. 328-331, 354-356 (plur. opn. of George, C. J.); *id.* at pp. 360, 362-368, 377, 383 (conc. opn. of Kennard, J.).) Specifically, we concluded that the law "impinge[d] upon . . . a fundamental autonomy privacy interest" (*American Academy*, *supra*, 16 Cal.4th at p. 340 (plur. opn. of George, C. J.); see also *id.* at p. 375 (conc. opn. of Kennard, J.)) and that the Attorney General had failed to prove *at trial* that the law would serve the compelling interests that he urged in its defense (*id.* at pp. 348, 356 (plur. opn. of George, C. J.); *id.* at pp. 376, 383 (conc. opn. of Kennard, J.)). Accordingly, we agreed with the trial court that the law was unconstitutional. (*Id.* at p. 359 (plur. opn. of George, C. J.); *id.* at pp. 383-384 (conc. opn. of Kennard, J.).)

The trial plaintiff seeks in this case is no more novel than the trial we approved in *American Academy*. Indeed, under the takings clause, the state does not face the difficult task that it faced in *American Academy* of proving that a regulation serves a compelling interest justifying an intrusion on

constitutional rights. (*American Academy*, *supra*, 16 Cal.4th at pp. 340-341 (plur. opn. of George, C. J.); *id.* at pp. 376, 383 (conc. opn. of Kennard, J.).) Rather, the government will prevail so long as the regulation's purpose is legitimate and the evidence indicates it advances its purpose in some substantial way. (*Nollan*, *supra*, 483 U.S. at p. 834, fn. 3 [107 S.Ct. at p. 3147].)

Far from being "novel" (maj. opn., *ante*, at p. 963) or "activist" (*id.* at p. 973), this rule simply represents the unremarkable conclusion that, if a regulation deprives someone of private property without substantially advancing its purpose, the government should pay compensation. In most cases, an economic regulation would quite obviously advance at least one of its purposes. Injunctions prohibiting enforcement of the regulation would not issue, and litigation would come to a quick and inexpensive conclusion by way of a defense motion for summary judgment. If a case did go to trial, then the regulatory body would likely have no difficulty demonstrating the effectiveness of the economic regulation. And, if the regulatory body did have difficulty, it should be wondering about the wisdom of its apparently failed regulatory policy, not wasting its resources on litigation.

Plaintiff argues in its complaint that the Santa Monica rent control law does not substantially advance its stated purpose of helping "tenants, especially the poor, minorities, students, young families, and senior citizens" overcome "the hardship caused by [a] serious housing shortage." In support of its argument, plaintiff alleges recent demographic changes in Santa Monica that suggest the law may have failed.

If we allow this case to go to trial, plaintiff will have a difficult time proving its claims. Many factors other than rent control may have caused or contributed to the demographic changes in Santa Monica that plaintiff alleges. Rent control may have slowed these changes and advanced its stated purposes in that way. Also, the long-term effects of rent control may not yet have fully manifested. Finally, at the very least, rent control in Santa Monica has presumably benefited tenants who were already in their apartments when it began and who have remained there. The decision to benefit one constituency over another—for example, to benefit existing tenants by preserving their low rents at the expense of prospective tenants who cannot find housing—is a policy decision that a legislative body is generally free to make. (*Schnuck* v. *City of Santa Monica* (9th Cir. 1991) 935 F.2d 171, 175.) Therefore, in order to prevail, plaintiff would have to show that benefiting existing tenants at the expense of prospective tenants is somehow inconsistent with the stated purpose of helping "tenants, especially the poor, minorities, students, young families, and senior citizens" overcome "the hardship [of a] serious housing shortage."

In sum, I share some of the majority's skepticism about plaintiff's assertions. (Maj. opn., *ante*, at pp. 969-971.) Nevertheless, on demurrer, a court must "take the properly pleaded material allegations of the complaint as true; [its] only task is to determine whether the complaint states a cause of action." (*Snyder* v. *Michael's Stores, Inc.* (1997) 16 Cal.4th 991, 995 [68 Cal.Rptr.2d 476, 945 P.2d 781].) Therefore, our views of the merits of plaintiff's allegations are irrelevant. Plaintiff might somehow establish, perhaps with expert opinion or empirical data, that sufficient time has passed since the introduction of rent control· in Santa Monica to evaluate its long-term effects and that rent control has been the critical factor behind the demographic changes that plaintiff alleges. In addition, plaintiff might somehow further establish that "the poor, minorities, students, young families, and senior citizens" whom the authors of the law "especially" intended to benefit were more likely to be prospective tenants who have not benefited from rent control than existing tenants who presumably did benefit.

Even if we are skeptical about plaintiff's ability to prove its case, I believe it should have a chance to try. Moreover, we should not require plaintiff to prove what is tantamount to a due process violation when it has brought a takings case. Accordingly, I dissent.

**BROWN, J.,** Dissenting.—Plaintiff seeks an opportunity to prove its claim that Santa Monica's rent control ordinance violates the Fifth Amendment of the United States Constitution. If the standards enunciated by the Supreme Court in *Nollan* v. *California Coastal Comm'n* (1987) 483 U.S. 825 [107 S.Ct. 3141, 97 L.Ed.2d 677] (*Nollan*) and *Dolan* v. *City of Tigard* (1994) 512 U.S. 374 [114 S.Ct. 2309, 129 L.Ed.2d 304] (*Dolan*) apply, Santa Monica must show its ceiling on residential rents has "substantially advanced" the ordinance's legitimate aims and establish a rough proportionality between regulatory means and ends.

Out of the conviction that more than a decade of reinvigorated takings jurisprudence has changed nothing, the majority concludes the rational basis test is *still* the takings clause standard. On that basis alone, the majority refuses to grant plaintiff the chance to prove its case. According to its reasoning, not only does the takings clause *not* require Santa Monica to demonstrate a reasonable "fit" or "proportional relationship" between the ordinance's restrictions on rental property and the ends it is said to further, it is sufficient to *suppose* the ordinance "substantially advances" those ends. The Fifth Amendment, the majority decides, requires no more.

The majority *is* wrong. Arbitrary government actions which infringe property interests cannot be saved from constitutional infirmity by the

beneficial purposes of the regulators. The framers of the takings clause sought to protect private property without regard to the decency of the government's intentions. (See Van Alstyne, *Inverse Condemnation: Unintended Physical Damage* (1969) 20 Hastings L.J. 431, 495.) Although the takings clause is not a guarantee of the economic status quo, it does provide a bulwark against unfairness. (Sax, *Takings and the Police Power* (1964) 74 Yale L.J. 36, 57.) It is not the fact of loss but the imposition of loss by unfair means which the takings clause seeks to prevent. (*Ibid.*)

And it is this critical assessment of fairness—variously described as "proportionality," "cost spreading," "means-ends," or "reciprocity of advantage"—which the majority declines to undertake when it invokes the rational basis test to insulate Santa Monica's rent control ordinance from challenge.

I.

### The Logical Limits of Judicial Deference

Judicial review is properly conceived in narrow terms. It is not a license to supersede the exercise of power by a coordinate branch which acts well within constitutional boundaries. Thus, I agree with the majority that it is generally improper for us to put legislation on trial. (Maj. opn., *ante*, at pp. 963, 973.) "[T]he proper course is to recognize that a [legislative body] can do whatever it sees fit to do unless it is restrained by some express prohibition in the Constitution of the United States or of the State, and that Courts should be careful not to extend such prohibitions beyond their obvious meaning by reading into them conceptions of public policy that the particular Court may happen to entertain."[1] (*Tyson & Brother* v. *Banton* (1927) 273 U.S. 418, 446 [47 S.Ct. 426, 433-434, 71 L.Ed. 718, 58 A.L.R. 1236] (dis. opn. of Holmes, J.).) As even the majority acknowledges, however, there are "circumstances in which some greater degree of judicial

---

[1] I strongly disagree with the aggressive notion of appropriate judicial review espoused by one of my dissenting colleagues. He notes the plurality in *American Academy of Pediatrics* v. *Lungren* (1997) 16 Cal.4th 307 [66 Cal.Rptr.2d 210, 940 P.2d 797] "expressly endorsed a procedure whereby the lower court did exactly what the majority [here] decries: it 'invalidate[d] legislation that it [found], after a trial, [would] fail[] to live up to expectations.' " (Dis. opn. of Chin, J., *ante*, at p. 1022.)

In my view, this "procedure" improperly usurped legislative power and injected the court into an area in which it could claim no competence. A trial may be a crucible for finding truth, i.e., determining what particular facts occurred in a particular case, but it is not a crucible for revealing "The Truth." "[I]n matters of normative judgment, no court should be in the position to supplant a society's collective understanding, distilled through experience and expressed in legislative enactments, on the basis of the evidence presented in a single case. . . . [¶] When fundamentally moral and philosophical issues are involved and the questions are fairly debatable, the judgment call belongs to the Legislature." (*American Academy of Pediatrics* v. *Lungren, supra*, 16 Cal.4th at pp. 446-447 (dis. opn. of Brown, J.).)

scrutiny . . . is appropriate," particularly when "fundamental constitutional rights [are] at stake." (Maj. opn., *ante*, at p. 973, fn. 4.)

The majority's call to deference thus rests on an unspoken and critical assumption: that property merits only an inferior level of protection. That conclusion, a historical artifact of the demise of the *Lochner* era,[2] has no defensible constitutional provenance.

Under the Fifth Amendment of the United States Constitution no person may be "deprived of life, liberty, or property without due process of law" and private property may not be "taken for public use without just compensation." The Fourteenth Amendment contains a virtually identical clause. (Cf. Cal. Const., art. I, § 7.)

Nothing in the text or structure of either provision suggests an infringement of a property interest ought to be accorded greater deference than a restriction on a liberty interest. Economic freedoms are no different from other freedoms protected by the Constitution. "[I]t would have seemed a strange anomaly to those who penned the words in the Fifth [Amendment] to learn that they constituted severer restrictions as to Liberty than Property . . . . I can see no more persuasive reason for supposing that a legislature is *a priori* less qualified to choose between 'personal' than between economic values; and there have been strong protests, to me unanswerable, that there is no constitutional basis for asserting a larger measure of judicial supervision over the first than over the second." (Hand, The Bill of Rights (1960) pp. 50-51; see also *Dolan, supra,* 512 U.S. at p. 392 [114 S.Ct. at p. 2320] ["We see no reason why the Takings Clause of the Fifth Amendment, as much a part of the Bill of Rights as the First Amendment or Fourth Amendment, should be relegated to the status of a poor relation in these comparable circumstances."].)

---

[2]*Lochner (Lochner* v. *New York* (1905) 198 U.S. 45 [25 S.Ct. 539, 49 L.Ed. 937]) is the name that has come to symbolize judicial usurpation of power. But the problem with *Lochner* was not that it sought to make judicial review meaningful or that it deemed economic interests worthy of protection. The *Lochner* court was justly criticized for using the due process clause "as though it provided a blank check to alter the meaning of the Constitution as written." (*Harper* v. *Virginia Bd. of Elections* (1966) 383 U.S. 663, 675 [86 S.Ct. 1079, 1086, 16 L.Ed.2d 169].) The "revolution of 1937" ended the era of economic substantive due process but it did not dampen the court's penchant for rewriting the Constitution. Although the court left the protection of property interests largely to the mercy of legislatures, it continued to apply substantive due process to the protection of civil liberties. "As several of the Justices have noted in dissent, there is only a verbal difference between the 'fundamental rights' branch of the compelling governmental interest test and the now discredited substantive due process doctrine of such cases as *Lochner.* . . . Both of them leave the Court entirely at large, with full freedom to enact its own natural law conceptions. The only difference is in the type of interests that are protected . . . ." (Lusky, By What Right? (1975) p. 266, fns. omitted.)

I, too, find the dichotomy inexplicable. (See *Board of Education* v. *Barnette* (1943) 319 U.S. 624, 648 [63 S.Ct. 1178, 1190, 87 L.Ed. 1628, 147 A.L.R. 674] (dis. opn. of Frankfurter, J.) ["The Constitution does not give us greater veto power when dealing with one phase of 'liberty' than with another. . . . Our power does not vary according to the particular provision of the Bill of Rights which is invoked."].)

Indeed, the ownership of property is itself an aspect of liberty. "Property does not have rights. People have rights. The right to enjoy property without unlawful deprivation, no less than the right to speak or the right to travel, is in truth a 'personal' right . . . . [A] fundamental interdependence exists between the personal right to liberty and the personal right [to] property. Neither could have meaning without the other. That rights in property are basic civil rights has long been recognized. J. Locke, Of Civil Government 82-85 (1924) . . . ." (*Lynch* v. *Household Finance Corp.* (1972) 405 U.S. 538, 552 [92 S.Ct. 1113, 1121, 31 L.Ed.2d 424].)

Nevertheless, in the aftermath of *Lochner* and its progeny, the federal high court articulated such a hierarchy, relegating economic rights to a decidedly inferior status. This has resulted in a judicial review not merely deferential but actually nonexistent. The rational basis test—a standard of review which allows legislative action to stand if the court can hypothesize any perfunctory justification for it—is as bad in its own way as substantive due process. Neither approach finds support in the constitutional text.

II.

## THE REVIVAL OF MEANINGFUL REVIEW

In the takings arena, at least, the high court has moved to reclaim some of the ceded territory by imposing a heightened level of scrutiny. There are traces in *Nollan* suggesting a renewed appreciation of the connection between liberty and property. The majority insists this is no more than rational basis by another name, requiring the party challenging a rent control ordinance to show " 'it constitutes an arbitrary regulation of property rights.' " (Maj. opn., *ante*, at p. 967, quoting *Dolan*, *supra*, 512 U.S. at p. 391, fn. 8 [114 S.Ct. at p. 2320].) Wrong.

The practical meaning of *Nollan* is the court's statement that "land-use regulation does not effect a taking if it '*substantially advance*[*s*] legitimate state interests' . . . ." (483 U.S. at p. 834 [107 S.Ct. at p. 3147], italics added.) That statement describes a *relational* formula, one requiring judges deciding claims under the takings clause to scrutinize the connection or "fit"

between property restraints and the ends they purportedly further. The relation is more than one of logic, however, more than a naked "rational" connection between means and ends. It tests both the utility *and* the proportionality of government-imposed restraints on property. And it challenges government to justify the means chosen to further a particular end by asking two questions.

First, *how* does a particular limitation advance the ends the government asserts it furthers? Second, is the restraint "tailored" (in the language of equal protection) or "proportional" (in the language of the takings clause) to the end the government asserts is promoted? The inquiry is "equitable" in the chancery's traditional sense. Regulators whose land use restraints are challenged as takings are required to do more than speculate that a given restraint might conceivably advance a legitimate governmental end. They must substantiate, if only "roughly," a factually grounded, proportional relationship between property restraints and the goals they purportedly further.

Although the majority argues strenuously that these governing precedents must be narrowly limited to their facts, there is no basis in *Nollan* for concluding different tests apply to different kinds of regulatory takings, i.e., permit exactions but not legislative enactments. (*Manocherian v. Lennox Hill Hosp.* (1994) 84 N.Y.2d 385 [618 N.Y.S.2d 857, 643 N.E.2d 479]; see *Trimen Development Co. v. King County* (1994) 124 Wn.2d 261 [877 P.2d 187].) Why should the existence of a taking turn on the type of governmental entity responsible for the taking? For constitutional purposes, a taking is a taking. Some takings—physical seizures and regulations which deprive the owner of all economically viable use—are compensable per se; takings claims that fall outside those narrow categories are subject to heightened scrutiny—"a uniform, clear and reasonably definitive standard of review in takings cases." (*Manocherian, supra*, 643 N.E.2d at p. 483.) Indeed, the dissent in *Nollan* complained that the majority's rationale would impact all regulatory takings cases and noted the court's "exactitude" was inconsistent with its prior standard for reviewing the rationality of a state's exercise of its police power. (*Ibid.*, quoting *Nollan, supra*, 483 U.S. at pp. 842-843 [107 S.Ct. at pp. 3151-3152] (dis. opn. of Brennan, J.).)

As Gerald Gunther has pointed out, the legitimacy of means-focused scrutiny is as old as the Constitution itself. It requires courts to "take seriously a constitutional requirement that has never been formally abandoned: that legislative *means must substantially further* legislative *ends*. . . . The core of that principle survived the constitutional revolution of 1937." (Gunther, *Foreword: In Search of Evolving Doctrine on a Changing Court: A*

*Model for a Newer Equal Protection* (1972) 86 Harv. L.Rev. 1, 20-21, italics added (*Evolving Doctrine*).)

Two features of *Nollan* bear directly on the question of the intensity of means scrutiny as applied to land use regulatory restraints. Unlike the rational basis standard, which forswears genuine evidentiary burdens on the government, *Nollan* contemplates a factual defense in support of the claim that a given regulatory restraint *actually* promotes specific ends. Professor Gunther has described the nature of the government's burden this way: "[Means scrutiny] requires that there be an affirmative relation between means and ends . . . . The model would have the Court assess the [government's] justification . . . largely in terms of information presented by the defenders of the law rather than hypothesizing data of its own." (*Evolving Doctrine, supra*, 86 Harv. L.Rev. at p. 47.)

What does *Nollan*'s "means scrutiny" amount to in the larger context of constitutionally permissible property restraints? Most notably, the *Nollan* standard is *non*substantive. It has no concern, strict or permissive, with the validity of legislative *ends*. Nor does it require land use regulators to demonstrate a "compelling interest" (or any interest) to justify them. Those are substantive matters left to political decisionmaking and legislative competence. And because it is means-focused, the *Nollan* test is instrumental, examining the utility of specific limitations regulators have chosen as furthering articulable ends, rather than the merits of the ends themselves.

### III.

#### FAIRNESS, PROPORTION, AND THE LIMITS OF DEMOCRATIC PROCESS

Although the constitutional compensation requirement is considered a necessary restraint on the despotic exercise of absolute, arbitrary, and uncontrollable government power (Story, Commentaries on the Constitution of the United States (1987) § 933, pp. 663-664; *Chicago, Burlington &c. R'd Co.* v. *Chicago* (1897) 166 U.S. 226, 237 [17 S.Ct. 581, 586, 41 L.Ed. 979]), courts have prudently recognized the takings clause "cannot be pressed to its grammatical extreme . . . ." (*Tyson & Brother* v. *Banton, supra*, 273 U.S. at p. 446 [47 S.Ct. at p. 433] (dis. opn. of Holmes, J.).) There must be, in Justice Holmes's descriptive phrase, "some play . . . to the joints" for the machinery of government to work. (*Ibid.*; see *Penna. Coal Co.* v. *Mahon* (1922) 260 U.S. 393, 412-416 [43 S.Ct. 158, 159-160, 67 L.Ed. 322, 28 A.L.R. 1321].)

"[G]overnment regulation—by definition—involves the adjustment of rights for the public good. Often this adjustment curtails some potential for

the use or economic exploitation of private property." (*Andrus* v. *Allard* (1979) 444 U.S. 51, 65 [100 S.Ct. 318, 326-327, 62 L.Ed.2d 210].) The constitutional guarantee against uncompensated takings is not violated by every adjustment of the benefits and burdens of economic life, but it is contravened when the adjustment is clearly disproportionate, "forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." (*Armstrong* v. *United States* (1960) 364 U.S. 40, 49 [80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554].) It is this elementary notion—that the takings clause embodies a fundamental principle of fairness in the distribution of economic burdens—that the *Nollan/Dolan* matrix seeks to effectuate. In the context of regulatory takings, the means-ends test allows a rough approximation of where government action falls along a continuum ranging from clearly permissible general adjustments, those that "secure[] an average reciprocity of advantage," as Justice Holmes described them (*Penna. Coal Co.* v. *Mahon, supra*, 260 U.S. at p. 415 [43 S.Ct. at p. 160]), to unconstitutional predatory or rent-seeking exactions.

In his concurring and dissenting opinion in *Pennell* v. *San Jose* (1988) 485 U.S. 1, 15 [108 S.Ct. 849, 859, 99 L.Ed.2d 1], Justice Scalia illustrated this means-ends relationship. That case involved due process, equal protection and takings clause challenges by landlords to the San Jose rent control ordinance. A majority of the court refused to decide the takings claim on the ground "it would be premature to consider this contention on the present record." (*Id.* at p. 9 [108 S.Ct. at p. 856].) But in his separate opinion, Justice Scalia addressed the takings clause claim. Because one of the provisions of the San Jose ordinance used to fix residential rent ceilings included a "tenant hardship" factor, the ordinance, according to Justice Scalia, had the effect of requiring landlords to subsidize those tenants unable to pay market rents. That consequence, Justice Scalia wrote, violated the takings clause: "The traditional manner in which American government has met the problem of those who cannot pay reasonable prices for privately sold necessities—a problem caused by the society at large—has been the distribution to such persons of funds raised from the public . . . through taxes . . . . Unless we are to abandon the guiding principle of the Takings Clause that . . . is the only manner that our Constitution permits." (*Pennell* v. *City of San Jose, supra*, 485 U.S. at pp. 21-22 [108 S.Ct. at pp. 862-863] (conc. and dis. opn. of Scalia, J.).)

No provision of the Santa Monica rent control ordinance resembles the "tenant hardship" feature of the ordinance in *Pennell*. But Justice Scalia's point—that the hardship factor violated the takings clause by arbitrarily transferring value from one (landlords) to another (tenants unable to pay rent)—is no different in principle from the effect of *any* rent control measure. All such redistributive schemes involve an implicit subsidy of tenants

by property owners, a subsidy by which value is taken from one and given to another.

It is not the transfer of value that is constitutionally suspect; it is the *distributive inequality of the means* by which it is effected. If the core principle underlying the takings clause is that "public burdens . . . should be borne by the public as a whole," (*Armstrong* v. *United States, supra,* 364 U.S. at p. 49 [80 S.Ct. at p. 1569]) that principle is arguably violated by *all* rent control schemes. Instead of raising the sums necessary to provide subsidies to qualified renters through a general public tax—the "traditional manner" by which public subsidies have been raised—rent control singles out a small segment of the public, owners of residential rental property, to bear the entire cost. The effect is to "load[] upon one individual more than his just share of the burdens of government" and to require that "he surrender[] to the public something more and different from that which is exacted from other members of the public . . . ." (*Monongahela Navigat'n Co.* v. *United States* (1893) 148 U.S. 312, 325 [13 S.Ct. 622, 626, 37 L.Ed. 463].)[3]

There is a troubling political feature to rent control as well, one also underlined in Justice Scalia's separate opinion in *Pennell.* (485 U.S. at pp. 20-23 [108 S.Ct. at pp. 862-863].) "The politically attractive feature of [rent control] is not that it permits wealth transfers to be achieved that could not be achieved otherwise; but rather that it permits them to be achieved 'off budget,' with relative invisibility and . . . relative immunity from . . . democratic processes. San Jose might, for example, have accomplished something like the result here by simply raising the real estate tax upon rental properties and using the additional revenues . . . to pay part of the rents of 'hardship' tenants . . . . Subsidies for . . . groups [e.g., senior citizens, students, the handicapped, or war veterans] may well be a good idea, but because of the . . . Takings Clause our governmental system has required them to be applied, in general, through the process of taxing and spending, where both economic effects and competing priorities are more evident." (*Id.* at pp. 22-23 [108 S.Ct. at p. 863] (conc. and dis. opn. of Scalia, J.); cf. *Prop. Owners Ass'n, etc.* v. *Tp. of No. Bergen* (1977) 74 N.J. 327 [378 A.2d 25, 31, 5 A.L.R.4th 908] ["compelled [rent] subsidization by landlords or by tenants who happen to live in an apartment building with [low income] senior citizens" held unconstitutional as confiscatory].)

---

[3]The author of today's majority opinion dissented in *Pennell* v. *City of San Jose* (1986) 42 Cal.3d 365 [228 Cal.Rptr. 726, 721 P.2d 1111]. His views reflected the same *Armstrong*-like theme of distributive unfairness as Justice Scalia's dissent: "[T]he issue is whether [the] obligation [of satisfying the housing needs of those with low incomes] can be thrust upon private property owners rather than remain a responsibility of society as a whole through tax-supported government agencies. . . . I am convinced [San Jose's] scheme is unconstitutional." (*Pennell* v. *City of San Jose, supra,* 42 Cal.3d at pp. 375-376 (dis. opn. of Mosk, J.).)

The politics of rent control are not confined to "invisible" regulations. Santa Monica's program was approved by a majority of the city's voters. Does that "democratic" feature eliminate the concerns Justice Scalia expressed in *Pennell*? Would overwhelming voter approval of a proposal to confiscate the assets of a local (and unpopular) religious sect survive constitutional scrutiny? In American constitutional discourse, such questions lack legitimacy; they neither require nor deserve a response: The "very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property . . . and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections." (*Board of Education* v. *Barnette, supra,* 319 U.S. at p. 638 [63 S.Ct. at pp. 1185-1186] (per Jackson, J.).) The difficulty with such distributive schemes is not, to borrow from Alexander Bickel, the "counter-majoritarian difficulty," it is the *majoritarian* difficulty itself. (Cf. Bickel, The Least Dangerous Branch (2d ed. 1986) pp. 16-23.) Along with other provisions of the national Constitution, the takings clause stands as a bulwark against confiscatory acts by a majority.

Nor are the social effects of an unprincipled majoritarianism difficult to discern. As Justice Scalia's dissent in *Pennell* suggests, it is not likely that a majority of voters would approve publicly financed rent control; if, that is, *voters* had to pay the cost. Of course, *someone* must pay the substantial cost of rent ceilings. When those costs are paid by rental property owners through government compulsion, however, it is impossible to measure the intensity of public support for rent subsidies. A majority is thus able to impose ceilings on rents while, at the same time, shifting their cost from the public to a small minority—owners of rental property. Thus, *Nollan*'s proportionate impact requirement "does more than distribute the costs of government programs. It has the desirable allocative consequence of reducing the frequency of undesirable government programs in the first instance. . . ." (Epstein, *Rent Control and the Theory of Efficient Regulation* (1989) 54 Brook. L.Rev. 741, 755; see also Nozick, Anarchy, State and Utopia (1974) pp. 270-271 ["So why do people find the subletting-allowed scheme [of rent control] unacceptable? It[s] defect is that it makes explicit the partial expropriation of the owner."].)

The fact that the state has acted through "the landlord-tenant relationship does not magically transform general public welfare, which must be supported by all the public, into mere 'economic regulation' which can disproportionately burden particular individuals." (*Pennell* v. *San Jose, supra,* 485 U.S. at p. 22 [108 S.Ct. at p. 863] (conc. and dis. opn. of Scalia, J.).) The key

to the takings clause is fairness, and the imposition of loss by unfair means is what the clause seeks to prevent. Thus, "just compensation," like the notion of "just price," contains a subtext of reciprocity. The "substantially advance" test is just a way of measuring whether the benefit and burden are relatively equal. If they are, compensation is not required. Where government can demonstrate a close, and proportional, match between means and ends, i.e., a "proportional nexus," the impact of the regulation is necessarily small, the burden offset by the benefit, and the interference spread over the general population. Where the connection between the regulation and its purported ends is both indirect and conjectural, or clearly disproportionate, fairness and justice require that compensation be paid. (*Dolan, supra,* 512 U.S. at p. 391 [114 S.Ct. at p. 2319]; *Nollan, supra,* 483 U.S. at p. 865 [107 S.Ct. at p. 3163].)

Instead of attempting to measure the actual fit between the city's rent ceiling and its fact-based justifications for the ordinance, the majority applies an enfeebled rational basis standard, and contents itself with supposing that some generalized conception of the public good might be promoted by the means chosen. But a laissez-faire attitude toward takings claims is no longer good enough. The United States Supreme Court's precedents appear to establish a minimal level of protection which this court lacks authority to diminish.

Indeed, even on its own terms, today's decision is anomalous. In effect, the majority concedes the ordinance does not further its stated goal of "providing affordable housing for the poor, the elderly, and young families" (maj. opn., *ante,* at pp. 969, 970-971) by quoting approvingly from the *due process* analysis of *Schnuck* v. *City of Santa Monica* (9th Cir. 1991) 935 F.2d 171, 175 (*Schnuck*): "[Plaintiff] contends that the Rent Control Law does not 'substantially advance' its purpose, which she misperceives as only to help the poor, elderly, minorities, and families with children. The Rent Control Law's stated purpose is to help all Santa Monica tenants, not just those within the mentioned groups, and not those who wish to become tenants there. [Citation.] Controlling rents to a reasonable level and limiting evictions substantially alleviate hardships to Santa Monica tenants. That rent control may unduly disadvantage others, or that it may exert adverse long-term effects on the housing market, are matters for political argument and resolution; they do not affect the constitutionality of the Rent Control Law." (Fns. and italics omitted; see maj. opn., *ante,* at p. 970.) But these are precisely the concerns which affect the constitutionality of the ordinance under the takings clause.

The *Schnuck* court declined to consider the regulatory takings claim because the plaintiff, who objected to the ordinance as applied, had not

sought compensation through an inverse condemnation action. (*Schnuck, supra,* 935 F.2d at pp. 173-174.) The case certainly cannot be cited for the proposition that such a broad statement of purpose ("to help all Santa Monica tenants" [italics omitted]) would survive a challenge under the takings clause. Moreover, in a case decided after *Schnuck,* the high court left no doubt that the "substantially advance" test is properly applied to regulatory takings claims. (See *Yee* v. *Escondido* (1992) 503 U.S. 519, 534 [112 S.Ct. 1522, 1532, 118 L.Ed.2d 153] [petitioners "allege in this Court that the ordinance does not ' "substantially advance" ' a ' "legitimate state interest" ' no matter how it is applied. See *Nollan* v. *California Coastal Comm'n, supra,* at p. 834; *Agins* v. *Tiburon,* 447 U.S. 255, 260 (1980) [100 S.Ct. 2138, 2141, 65 L.Ed.2d 106]."].)

Regulatory takings claims implicate both prongs of the Fifth Amendment. To survive a takings challenge, the government's actions must substantially advance narrowly tailored goals. Conversely, to defend broadly defined exercises of the police power, the government must show that general public burdens are not being imposed arbitrarily or in a discriminatory fashion. The "substantially advance" test thus *assumes* the legitimacy of the state's interest. But the legitimacy and validity of that interest is always open to a challenge under the due process clause. In this case, if Santa Monica's goal under the ordinance may be broadly defined as assisting all tenants, then landlords can be compelled to subsidize those who are better off than they are and to subordinate their priorities to the priorities of all their tenants. The plaintiff in *Schnuck,* for example, was an elderly widow who owned an eight-unit apartment building subject to the Santa Monica rent control ordinance. She lived in a third floor apartment and rented the other units. After suffering a stroke, she wanted to move to the first floor apartment in order to avoid having to climb the stairs. The first floor tenant refused to move, however, and the rent control board informed Schnuck that the tenant could not be evicted. (*Schnuck, supra,* 935 F.2d at p. 172.) How can such an arbitrary and despotic regime be justified as a proper exercise of the police power—even under the less exacting standards of the due process clause?

Concurring in *Railway Express* v. *New York* (1949) 336 U.S. 106 [69 S.Ct. 463, 93 L.Ed. 533], Justice Jackson wrote that the "framers of the Constitution knew, and we should not forget today, that there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally. Conversely, nothing opens the door to arbitrary action so effectively as to allow those officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were

affected." (*Id.* at pp. 112-113 [69 S.Ct. at pp. 466-467].) Justice Jackson was discussing the equal protection clause, but as Professor Gunther has pointed out, imposing a minimally rational means-ends test, whether under the due process and equal protection clauses or the "substantially advance" standard of the takings clause would help "to assure rationality of means, without unduly impinging on legislative prerogatives regarding ends." (Evolving Doctrine, *supra*, 86 Harv. L.Rev. at p. 23.)

CONCLUSION

The majority's assertion that "the heightened intermediate scrutiny standard articulated in *Nollan* and *Dolan* does not apply in this case" (maj. opn., *ante*, at p. 967) is more wish than fact. Rent control measures have been upheld by the United States Supreme Court under circumstances easily distinguished from those present here. Controls have been sustained as either short-term "emergency" measures (e.g., *Block* v. *Hirsh* (1921) 256 U.S. 135 [41 S.Ct. 458, 65 L.Ed. 865, 16 A.L.R. 165] [war powers clause]) or against challenges under the *due process* clause, a quite dissimilar standard. (See, e.g., *Pennell* v. *San Jose*, *supra*, 485 U.S. at pp. 11-13 [108 S.Ct. at pp. 857-858]; see also *Nollan*, *supra*, 483 U.S. at pp. 834-835, fn. 3 [107 S.Ct. at p. 3147].) In light of the history of due process economic standards discussed above, these cases provide no basis for assuming such controls will survive *Nollan*'s means scrutiny under the just compensation clause. Indications are to the contrary (compare *Chastleton* v. *Sinclair* (1924) 264 U.S. 543 [44 S.Ct. 405, 68 L.Ed. 841] with *Nollan*, *supra*, 483 U.S. 825), and the question remains an open one. If such measures are capable of withstanding a *Nollan*-inspired takings clause analysis, the high court ought to tell us so, preferably sooner rather than later.

Until that day, I dissent.